UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                              NO. 4:12-cr-20101

v.

                              HON. MARK A. GOLDSMITH

GREGORY McKNIGHT,              United States District Judge

        Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The Unites States of America, by its undersigned attorneys, respectfully submits this Memorandum in anticipation of defendant Gregory McKnight's sentencing. For the reasons provided below, the government requests that the court sentence defendant Gregory McKnight to the top of the sentencing guidelines of 151-188 months.

## FACTS

### "We will never resort to paying out earnings from "new money" like the filthy scamming HYIPs"[1]

In December of 2005, defendant Gregory McKnight began offering a business opportunity to the general public in which investors would "loan" McKnight money and he would pay a predetermined amount of interest on that money, ranging from .25% per day to 12% per month, depending on the length of investment.[2] The program was called Legisi, which was an acronym for <u>L</u>ucrative <u>E</u>lectronic <u>G</u>old <u>I</u>ncome <u>S</u>ervices <u>I</u>nternational. Defendant resided in Swartz Creek, Michigan, and conducted business from both his residence and an office located on Miller Road in Flint. To facilitate the Legisi program, defendant formed Legisi Holdings,

---

[1] Statement of Gregory McKnight on the front page of the Legisi website during the course of his Ponzi scheme known as Legisi.

[2] Such investment programs are commonly referred to High Yield Investment Programs, or HYIPs.

LLC, which was incorporated in Nevis, West Indies; defendant was the founder, owner, and president of Legisi Holdings, LLC.  McKnight directly employed only two individuals, his niece and nephew, to assist in the daily operations of the business.

Prior to beginning Legisi, McKnight worked for General Motors where he was employed as an electrician.  When he endeavored down the Legisi path, McKnight had no formal investment training.  In other words, McKnight had no official schooling in the foreign exchange markets, the commodities markets, the stock market, or any other vehicle in which he invested investor funds.  Thus, it appears that McKnight was, at best, a self-taught investor.

The Legisi program was open to literally anyone around the world through a publically available website at www.legisi.com.  *See exhibit 1*.  On the Legisi website, defendant made material and significant (false) representations.  Among the falsities, McKnight promised that he would invest the funds given to him by investors and then pay the investors each month, which payments would be funded with profits from his investments.  *Id*.  Defendant further represented that his investing activities consistently generated a profit.  In the Frequently Asked Questions section of the website, McKnight posed the following question and answer, "How do you pay out such high returns?  We are obviously receiving a higher return on our invested funds.  We repay our Members and keep a small profit for ourselves. Everybody's happy."  *Id. at pg. 5*.  To further the fraudulent inducement, defendant also claimed that he set aside 10% of all his investing profits each month to create a reserve account for the benefit of investors in the event that his investments failed to earn the expected return.  *Id. at pg. 2*.  Defendant stated:

> [a]nother *Legisi* feature that sets us apart from the scammers is that **10%** of our profits are set aside each and every month in a **Reserve Account**. The types of investments that *Legisi* holds do carry some risk. If one of these fails to earn the expected return in any given month or fails completely, we don't want the **Membership** to bear this loss. We will draw from this **Reserve Account** account [sic] any time there are shortfalls in Legisi's monthly income to **ensure** that our

>Members receive their promised earnings.  We will continue to add to the **Reserve Account** until it equals **110%** of the total amount loaned to us and maintain it at that level.  *Id.* (*emphasis in original*).

The statement regarding the Reserve Account is particularly significant as it created the impression that investor funds were essentially guaranteed.

Over the course of the Legisi program, McKnight accepted millions of dollars of investor money.  Indeed, an analysis of the records of Legisi and the companies with which he conducted business revealed that, from December 2005 through November 2007, McKnight (and others working with him[3]) raised approximately $72 million dollars from over 3,000 members of the public[4].  The outlandishly high interest rates offered by McKnight were obviously extremely tantalizing to the unsuspecting public.

As if the exorbitantly high interest rates were not enough to induce investors into defendant's scam, Legisi also offered a referral program whereby investors could earn a 5% to 7% commission on the amount of new funds that a referred investor placed in the program.  As McKnight explained,"[a]s an **Active Member** of *Legisi.com*, you are encouraged to refer friends, colleagues, and your own website visitors to us and benefit from an additional source of income — a **5% - 7%** incentive bonus for each new account opened by your referrals and on any and all future deposits from them!"  *Id. at pg. 10.  (emphasis in original).*

The principle mechanism by which investor funds would be funneled to defendant was through the utilization of the internet via digital currency, particularly e-gold and e-bullion[5].  The

---

[3] Matthew Gagnon, who heavily promoted the Legisi program on his own website Mazu.com, is currently charged by way of criminal complaint in the Eastern District of Michigan for his involvement in the Legisi scheme.  *See United States v. Matthew J. Gagnon, 11-mj-30632.*

[4] Investors originated from all 50 states and approximately 33 foreign countries (Australia, Bahamas, Belgium, Canada, Cyprus, Demark, England, Finland, France, Germany, Greece, Iceland, India, Ireland, Israel, Italy, Japan, Netherlands, New Zealand, Norway, Malaysia, Mexico, Nigeria, Philippines, Saudi Arabia, Singapore, Slovenia, South Africa, South Korea, Sweden, Spain, Thailand, Trinidad West Indies).

[5] Digital currencies such as e-gold and e-bullion are similar in nature to Paypal.  However, due to lax or nonexistent oversight and essential anonymity, the United States Government shut down e-gold.  In 2007, the United States

use of these non-traditional funding methods provided McKnight with the opportunity (at least for a while) to conduct the scheme below the radar of regulators. Given the large degree of anonymity involved with both e-gold and e-bullion (one only needed to provide a name and e-mail address to open and use these accounts), there are several investors who profited from the scam whose true identities have yet to be identified.

McKnight provided explicit instructions regarding how an investor invested his or her money with the program. For example, McKnight directed investors to go online and create an e-bullion or e-gold account and then fund that account through traditional banking methods (wire transfer / check); once the investor created and funded an e-bullion or e-gold account, he or she would go online and create and activate a Legisi account (www.legisi.com); once the investor's Legisi account was opened, the investor would fund the Legisi account by going online to the e-bullion / e-gold website and requesting that currency be transferred from the investors account to a McKnight controlled e-bullion or e-gold account[6]. Once the funds were transferred to one of his accounts, McKnight would comingle the investor's funds. After an investor opened and funded a Legisi account, the investor would select one of several "loan" programs in which the money could be invested. *See exhibit 1.* The programs varied in length and rate of return from the 30 day "tester" fund, which yielded a rate of .25% per day to the 1 year VIP fund, which yielded a rate of 12% per month. *See exhibit 1, pg. 2-3.*

---

government seized the property in approximately 58 e-gold accounts due to various criminal violations, including McKnight's account. *See United States v. All Property In/Underlying E-Gold Account Numbers: 2636005, 2825136 and 2828872, 07-cr-1346 (D.C.).* Moreover, in 2008, e-gold and its operators were convicted of money laundering and conspiracy to defraud the United States. *See United States v. E-gold, 07-cr-109 (D.C.).* And in 2006, the United States government commenced a forfeiture suit against e-bullion for operating an unlicensed money transmitting business, wire fraud, and money laundering. *See United States v. $1,802,651.56 in Funds Seized from E-bullion, et.al, 09-cv-1731.* James Fayed, the owner and operator of e-bullion, was later convicted in the State of California of having his wife murdered and sentenced to death row.

[6] McKnight controlled multiple e-bullion accounts held in the name of various entities, such as Greg McKnight (account B75831), Legisi Holdings (account B96566), Healthy Body Nutraceuticals (account B50965), and Lido Consulting (account B57108).

Once investor funds were in the Legisi program, the monies that were not illegally diverted were invested; they were not, however, profitable. For approximately the first eight months that the Legisi program was in existence, from the end of December 2005 through August 2006, investor funds were placed in other High Yield Investment Programs. This was quite obviously contrary to what was represented to investors, but more importantly, the money the investments were losing ventures. *See exhibit 2*.

Financial analysis indicates that after initially investing in other High Yield Investment Programs, the investment strategies changed by placing funds in more mainstream investments; what did not change, however, were the losses. Over the course of the balance of the scheme, investor funds were placed in various investment vehicles such as foreign currency options and futures trading accounts, commodity options and futures trading accounts, stocks, stock trading accounts, promissory notes, real estate, and other miscellaneous ventures. During this time, Legisi investments in foreign currency options and futures trading accounts and commodity options and futures trading accounts (the bulk of the investments) had net losses of approximately $3,849,852. *See exhibit 2*. McKnight's other investments made with investor funds had unrealized losses and gains, but no realized gains, with the exception of the sales of shares in two companies, in which his investments realized a gain of only $78,000.

As with any Ponzi scheme, McKnight sent a large portion of the funds that he received from investors to other investors. Of the approximately $72 million taken in, about $27.5 million was returned to investors as payments of purported returns on investments, referral commissions, and repayments of principal.

While it probably goes without saying, McKnight personally benefitted from the scam. McKnight used approximately $2,263,886 of investor funds for his and his family's personal use.

He spent at least $218,919 on motor vehicles, at least $190,682 in payments to or for the benefit of family members, at least $124,215 for home repairs and renovations, at least $108,311 for vacations and travel, and at least $102,024 to pay credit card bills. He, or his employee Danielle Burton, withdrew a total of $160,478 from automated teller machines and checks made out to cash. McKnight also paid himself a weekly "salary" which totaled $104,724. In addition to benefiting financially from the scam, it also appears that McKnight enjoyed the esteem of being "The Boss." *See exhibit 1, pg 9*. While he reaped the rewards of the scam, McKnight kept investors in the dark regarding the gargantuan losses that the program was sustaining, which losses inevitably shifted to investors.

As evidenced by his trading record, defendant knew that the representations that he made on the Legisi website were false. In other words, McKnight operated a classic Ponzi scheme where the source of the money paid out to investors was not derived from the profits of his investments (because there were no profits), but from new investor funds. Needless to say, defendant never established a reserve account for the benefit of Legisi members in the event that his investments failed to earn the expected return.

In addition to operating a Ponzi scheme, McKnight committed various securities violations. While McKnight himself referred to Legisi as a "loan" program, and demanded that "members" not refer to their "loan" and an "investment," Legisi was, in reality, an investment contract, which is considered a security[7] and therefore regulated by the Securities and Exchange

---

[7] Legisi was a pooled investment vehicle in which investors invested money into a common venture with the expectation that the money would be used to generate profits for McKnight and the investors, solely through the efforts of McKnight or others working on his behalf. In other words, the public invested money with McKnight, through the Legisi program; McKnight pooled the investor's funds rather than maintaining segregated accounts for each investor; and the investors expected profits from McKnight's investing and were passive investors, having no role in the generation of profits. Thus, Legisi was a security in the form of an investment contract. 15 U.S.C. § 77b(a)(1); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (holding that an investment contract exists if (1) a person invests his or her money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of

Commission. This semantic obfuscation was quite obviously an attempt to sidestep the securities laws. Indeed, on May 5, 2008, the Securities and Exchange Commission filed suit against McKnight and Legisi Holdings, LLC alleging several violations of the securities laws. *SEC v. McKnight*, 08-cv-11887 (EDMI 2008)(Judge Steeh). On July 6, 2011, that court entered a Final Judgment of Permanent Injunction and Other Relief against McKnight, after a Motion for Default by the SEC. *See exhibit 3*. The judgment ordered disgorgement of $2,384,558.35, including interest, representing the profits of the scheme, and $3,805,855.83, including interest, representing investor funds that McKnight diverted in furtherance of the scheme.

As part of the SEC case against McKnight, the court appointed a receiver, Robert Gordon, to take control of the assets of McKnight and his pertinent entities. With the oversight of the court, Mr. Gordon set up a claims procedure in which victims of Legisi could seek reimbursement for their losses. On June 7, 2012, the court approved Mr. Gordon's request to disburse $1.5 million to the various claimants of the Legisi scam[8]. In addition, Mr. Gordon has filed suit against several investors who profited from the Legisi scam and has filed various suits against individuals who invested money on McKnight's behalf, hoping to recoup funds and ultimately return additional funds to victims.

## SENTENCING GUIDELINE CALCULATIONS

On February 16, 2012, defendant pleaded guilty to a one count information that charged him with wire fraud in violation of 18 U.S.C. §1343. As discussed below, the parties and the probation department have calculated the advisory sentencing guideline range at 151 to 188 months. For the reasons stated below, the government requests that the court sentence defendant to a 188 month term of incarceration.

---

the promoter or third party.) Section 2(a)(1) of the Securities Act of 1933 defines "security" to include, among other things, "investment contracts."
[8] Unfortunately, this represents only a small fraction of the losses sustained by McKnight's victims.

The guideline for a violation of 18 U.S.C. §1343 is found at Section 2B1.1 of the United States Sentencing Guideline Manual. As mentioned, the parties and, independently, the probation department, applied numerous offense level adjustments under U.S.S.G. §2B1.1, resulting in an offense level of 37. The base level offense of a conviction under 18 U.S.C. §1343 is 7 points, as the statutory maximum for wire fraud is 20 years imprisonment. U.S.S.G. §2B1.1.

A.  Amount of Loss Calculation

U.S.S.G. §2B1.1(b)(1)(L) provides that if the loss amount exceeds $20 million and is less than $50 million, the total base level offense should be increased by 22. In the instant case, defendant is responsible for a loss of over $20 million, but less than $50 million.

In determining the amount of loss in fraud cases, a precise computation is not necessary. The district court need only make a reasonable estimate of loss, given the available information. U.S.S.G. §2B1.1, comment 3(C); *Unites States v. Triana*, 468 F.3d 308, 320 (6th Cir.2006).

The parties have determined that that the loss in this case is approximately $49 million. For scoring of guideline calculations, this is a figure to which defendant has admitted in the Rule 11 plea agreement and the government believes is a reasonable estimate of the loss given the amount of money paid out to investors during the scheme and returned to investors by the Receiver. By all measures, defendant's offense conduct resulted in a loss of more than $20 million but less than $50 million.

B.  Number of Victims Enhancement

U.S.S.G. § 2B1.1(b)(2)(C) provides that if the offense involved 250 or more victims, the total base level offense should be increased by 6 points. In the instant case, the fraud perpetrated by defendant involved more than 250 victims.

An analysis of the available records reveals that over 3,000 individuals or entities invested in Legisi. Due to the inherent nature of Ponzi schemes, not all investors suffered financial loss[9]. As the court is aware, Receiver Robert Gordon instituted a claims procedure for victims of Legisi to obtain reimbursement for their losses. Approximately 1,800 investors submitted claims to Mr. Gordon. The Secret Service and the United States Attorney's Office also conducted a review of applicable records to determine the number of victims who suffered a financial loss. That analysis confirmed that there are well over 250 victims. Moreover, McKnight admitted in the Rule 11 plea agreement that there were more than 250 victims from the Legisi scam. Thus, the enhancement of 6 points is appropriate.

C.  <u>Relocation & Sophisticated Means Enhancement</u>

U.S.S.G. § 2B1.1(b)(9)(A) & (C)[10] provides that "if (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials;…or (C) the offense otherwise involved sophisticated means, increase by 2 levels." In the instant case, the scheme was relocated to another country to evade regulatory officials and it involved sophisticated means. McKnight has agreed in the Rule 11 plea agreement that this enhancement is properly scored.

The Legisi website contained the following pronouncement as to why it is incorporated offshore:

> The most important reason that we are an offshore corporation is to protect our Membership from unwanted intrusions by governmental institutions. **Private Ventures** (like *Legisi.com*) with non-American entities (like *Legisi Holdings, LLC*) are exempt from all the entangling guidelines of the **SEC** and the **IRS**. Therefore, we can operate our program and repay our Members with high returns without having to hire an entire team of Lawyers and Accountants. And we avoid

---

[9] The government considers financial loss as the loss of principle investment, not the loss of the promised return.
[10] The 2011 Guideline manual lists this specific offense variable as §2B1.1(b)(*10*) as there was new offense variable added in 2011 thereby bumping the variable down one.

>paying huge fees that would severely impair the earnings our Members enjoy.
>*See exhibit 1, pgs. 4-5* (emphasis in original).

Thus, by McKnight's own admission, the" most important" reason to having incorporated in the West Indies was to avoid regulatory oversight. Moreover, in or around September of 2006, defendant moved the computer servers that housed the Legisi website and the investor information from the United States to a company called High Secured.com, located in the Country of Panama.

In addition to relocating the scheme offshore, McKnight's scheme qualifies as "sophisticated" under the guideline variable 2B1.1(b)(9)(C). While the ploy that defendant utilized to induce individuals to participate the scheme was not particularly sophisticated, the methods that he employed to obtain the money and subsequently transfer the money was sophisticated. For example, defendant utilized non-traditional money transmitting methods such as e-gold and e-bullion to increase anonymity and reduce regulatory oversight. He had multiple e-gold and e-bullion accounts in various different names. Defendant also had multiple traditional banking accounts which held investor funds.[11] Defendant created various corporate shells in which to hold and transfer investor funds[12]. The use of the internet to propagate the scheme added to the sophistication as it was easier to create and disseminate misinformation. Lastly, defendant's transactions in and amongst the various e-gold, e-bullion, traditional banking accounts and various corporate entities dramatically increased the complexity of scheme.

Given the scoring of the above-referenced enhancements, defendant's offense level is 37. These are all enhancement to which defendant has admitted in the Rule 11 plea agreement and

---

[11] McKnight had the following bank accounts: two accounts with Lansing Automakers Federal Credit Union, two accounts with LaSalle Bank Midwest, a Fifth Third Bank account, and a Wells Fargo Bank account.
[12] Such entities include Legisi Holdings, Legisi Marketing, Lindenwood Enterprises, Healthy Body Nutraceuticals, and Lido Consulting.

concurs are properly scored. Less three points for acceptance of responsibility, the total offense level is 34.

## APPLICATION OF 18 U.S.C. §3553

Title 18, United States Code, Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. To determine the "particular" sentence to impose, the court must consider the familiar statutory factors listed in §3553(a)(1)-(7). One of these factors is the advisory range set by the Sentencing Guidelines and another is the Commission's policy statements. See 18 U.S.C. §3553(a)(4) and (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. Unites States*, 552 U.S. 38 (2007).

A. Nature and Circumstances of the Offense and the History and Characteristics of Defendant

1. *Nature and circumstances of the Offense*

McKnight's conduct was damaging to hundreds of investors and devastating to others. He engaged in an extensive Ponzi scheme over the course of approximately 18 months that involved investments of over $72 million. His conduct has wreaked financial havoc on his victims and will undoubtedly have long lasting adverse consequences for many investors. McKnight's scheme demonstrated a profound disrespect for the law, and more importantly, for basic moral and ethical behavior[13]. McKnight's crime was not the result of some spontaneous decision borne out of financial distress; rather, it was committed with full knowledge of the

---

[13] In what is perhaps one of the more ironic statements on the Legisi website, McKnight stated the following in convincing his victims to trust him: "Legisi.com was planned from day one with a single thought in mind 'Treat others as you would like to be treated.'"

destructive consequences that it would have on his victims. McKnight ignored, or did not care, that his investors made significant life decisions based on his false promises.

As illustrated by the Victim Impact Statements, McKnight is responsible for not only wiping away the financial resources of families, but also for causing profound levels of emotional distress.

The applicable guideline range appropriately recognizes the seriousness of a financial fraud scheme of this magnitude and the deleterious effect that it had on its victims. Considering all these aspects of defendant's offense, the seriousness of this offense calls for a sentence at the top of the guidelines.

    2.    *History and Characteristics of Defendant*

Despite his capacity to make a living within the confines of the law, defendant chose to abandon honest work in pursuit of riches.

In 1978, defendant graduated from high school with average grades and has taken some college courses. To his credit, defendant served in the United States Navy from 1981 to 1985, receiving an honorable discharge. Defendant also spent several years working at General Motors as an electrician.

Defendant has no history of mental or emotional problems and does not appear to abuse any substances or have a gambling problem.

B.    <u>Sentence Imposed must Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide for Just Punishment</u>

A sentence at the top of the guidelines would reflect the seriousness of the offense, promote respect for the law, and adequately punish defendant for his broadly impactful criminal behavior. As described above, defendant concocted a tantalizing and dubious fraud scheme that financially and emotionally damaged hundreds of victims. His conduct was thoughtless and

callous as he showed no concern for his numerous victims. Such behavior calls for a lengthy prison sentence to punish defendant and to promote respect for the law. A sentence at the top of the guidelines is adequate to achieve those objectives.

C. <u>Sentence Imposed must Afford Adequate Deterrence to Criminal Conduct and Protect the Public from further Crimes of Defendant</u>

The Supreme Court has explained that "punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy* v. *Louisiana*, 554 U.S. 407, 128 S.Ct 2641 (2008). Deterrence is an important consideration as a sentence may serve to discourage others who are inclined to involve themselves in similar criminal conduct. Deterrence is also an important consideration when fashioning a sentence in that it will dissuade defendant from engaging in criminal behavior in the future.

Ponzi schemes require deterrence, both general and specific, which are best accomplished through lengthy prison sentences. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir.2006) (internal quotations omitted).

The justice system must send the appropriate message to those inclined to engage in extensive fraud. A sentence at the top of the sentencing guideline will serve the purpose of deterring other would-be fraudsters and deter defendant from re-offending.

D. <u>Need to Provide Defendant with Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner</u>

There is no need in this case to adjust the sentence outside the guideline range to provide defendant with educational or vocational training, medical care, or other correctional treatment.

13

E.  <u>Avoiding Unwarranted Sentence Disparities among Defendants with Similar Records Who have been Found Guilty of Similar Conduct</u>

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the guidelines, while carefully considering the 3553(a) factors, is the only available means of ensuring consistency in sentencing similarly situated defendants.

The court's obligation to ensure minimal sentence disparities among defendant's with similar records that have been found guilty of similar conduct is satisfied through the imposition of a sentence that is within the advisory guidelines.  If the court sentences defendant within the recommended guideline range, the probability of a sentencing disparity between similarly situated defendants is unlikely.

## **CONCLUSION**

In light of the egregious nature of defendant's conduct, the government submits that the 3553(a) factors support the imposition of a sentence at the top of the sentencing guideline range.

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition of a sentence at the top of the guidelines and the government urges the court, in exercising its discretion, to impose a period of incarceration of 15 years.

    Respectfully submitted,

    BARBARA L. McQUADE
    UNITED STATES ATTORNEY

    s/ A. TARE WIGOD
    Assistant United States Attorney
    210 Federal Building
    600 Church Street
    Flint, Michigan 48502
    Telephone number:  (810) 766-5177
    Email:  Tare.Wigod@usdoj.gov
    P58479

Dated:  September 5, 2012

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2012, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Edward Wishnow, Attorney for Defendant

s/ A. TARE WIGOD
Assistant United States Attorney
210 Federal Building
600 Church Street
Flint, Michigan 48502
Telephone number:  (810) 766-5177
Email:  Tare.Wigod@usdoj.gov
P58479
