Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of Michigan |
|---|---|---|

| Name (under which you were convicted):<br>Gregory N. McKnight | Docket or Case No.:<br>4:12-cr-20101-MAG-MJH-1 |
|---|---|

| Place of Confinement:<br>FCI Milan, MI | Prisoner No.:<br>46755-039 |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which you were convicted)<br>Gregory McKnight |
|---|---|
| v. | |

### MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    US District Court
    Eastern District of Michigan, Flint Division

    (b) Criminal docket or case number (if you know):  4:12-cr-20101-MAG-MJH-1

2.  (a) Date of the judgment of conviction (if you know):  2/16/2012

    (b) Date of sentencing:  8/6/2013

3.  Length of sentence:  188 months; 3 years supervised release

4.  Nature of crime (all counts):

    1 count wire fraud (18 U.S.C. 1343)

FILED
SEP 04 2015
CLERK'S OFFICE
DETROIT

5.  (a) What was your plea? (Check one)

    (1)   Not guilty ❑          (2)   Guilty ☑          (3)   Nolo contendere (no contest) ❑

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

    N/A

6.  If you went to trial, what kind of trial did you have? (Check one)          Jury ❑          Judge only ❑

Page 3

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ❑   No ❑

8. Did you appeal from the judgment of conviction?   Yes ☑   No ❑

9. If you did appeal, answer the following:

(a) Name of court:   U.S. Court of Appeals - 6th Circuit

(b) Docket or case number (if you know):   13-2075

(c) Result:   Denied

(d) Date of result (if you know):   6/17/2014

(e) Citation to the case (if you know):   N/A

(f) Grounds raised:

Anders Brief: (1) Whether direct appeal waiver was knowing (2) Whether sentence was procedurally or substantively unreasonable. Def.'s reply: (1)Court erred adopting expired plea agreement; (2) Court erred not keeping gov.'s promise to lower sentence; (3) Gov. breached Kastigar agreement using evidence for Information, (4) Plea Agreement, & (5) Sent. Mem.; (6)Court erred calculating restitution; & (7) Court erred adopting invalid plea agreement.

(g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ❑   No ☑

If "Yes," answer the following:

(1) Docket or case number (if you know):   N/A

(2) Result:

N/A

(3) Date of result (if you know):

(4) Citation to the case (if you know):   N/A

(5) Grounds raised:

N/A

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ❑   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:   N/A

(2) Docket or case number (if you know):   N/A

(3) Date of filing (if you know):

(4) Nature of the proceeding:   N/A

(5) Grounds raised:

   N/A

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑  No ✓

(7) Result:  N/A

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:  N/A

(2) Docket or case number (if you know):  N/A

(3) Date of filing (if you know):

(4) Nature of the proceeding:  N/A

(5) Grounds raised:

   N/A

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑   No ✓

(7) Result:  N/A

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:     Yes ❑   No ❑

(2)  Second petition:   Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

N/A

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

**GROUND ONE:**

  (See Attachment)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ☑

    (2) If you did not raise this issue in your direct appeal, explain why:

  Ineffective Assistance of Counsel (IAC) not generally cognizable on direct appeal.

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑  No ☑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:  N/A

    Name and location of the court where the motion or petition was filed:

  N/A

Docket or case number (if you know):   N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

N/A

Docket or case number (if you know):   N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A




**GROUND TWO:**

N/A

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

N/A

**(b) Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

N/A

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  N/A

Name and location of the court where the motion or petition was filed:

N/A

Docket or case number (if you know):  N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

N/A

Docket or case number (if you know):  N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

**GROUND THREE:**

N/A

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

N/A

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

N/A

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  N/A

Name and location of the court where the motion or petition was filed:

N/A

Docket or case number (if you know):  N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
  N/A

Docket or case number (if you know):  N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

  N/A

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

  N/A

**GROUND FOUR:**
 N/A

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

N/A

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

      Yes ❏  No ❏

    (2) If you did not raise this issue in your direct appeal, explain why:

    N/A

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

      Yes ❏  No ❏

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:  N/A

    Name and location of the court where the motion or petition was filed:
    N/A

    Docket or case number (if you know):  N/A

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    N/A

    (3) Did you receive a hearing on your motion, petition, or application?

      Yes ❏   No ❏

    (4) Did you appeal from the denial of your motion, petition, or application?

      Yes ❏   No ❏

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes ❏   No ❏

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:
    N/A

    Docket or case number (if you know):  N/A

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    N/A



(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

IAC claims generally not cognizable on direct appeal.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?     Yes ❏   No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

N/A

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

N/A

(b) At arraignment and plea:

Edward C. Wishnow, 240 Daines St., Birmingham, MI 48009

(c) At trial:

N/A

(d) At sentencing:

Edward C. Wishnow, 240 Daines St., Birmingham, MI 48009

(e) On appeal:

Gary W. Lanker, 3220 Whispering Pl., Ste. 197, Memphis, TN 38115

(f) In any post-conviction proceeding:

N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ❑ No ☑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ❑ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:  N/A

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:   N/A

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ❑   No ☑

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

    This Motion is filed within the time parameters of §2255.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

    A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

        (1) the date on which the judgment of conviction became final;

        (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

        (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

Vacate conviction or, in the alternative to otherwise correct sentence as it relates to claims concerning term of incarceration and/or restitution.

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on *September 4, 2015* (month, date, year).

Executed (signed) on ____*9/2/2015*____ (date).

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

28 U.S.C. §2255
UNITED STATES V. GREGORY MCKNIGHT
Case No. 4:12-cr-20101-MAG-MJH-1

ATTACHMENT

**GROUND ONE**

*Effective assistance of counsel extends to all critical stages of the criminal process. Here, counsel's assistance fell below reasonable standards at numerous, critical stages, from a failed cooperation agreement to abdicated factual disputes at sentencing. Harm is attached to each, and exposed for the Court's review in the following claims.*

**Claim 1.1**

*The waiver of a constitutional right can be valid only if the defendant knows what right he is giving up and has a reasonable understanding of the consequences of the loss of that right. Counsel never explained to Mr. McKnight that his collateral appeal waiver included his Sixth Amendment right to effective assistance of counsel, nor its corresponding implications. As a result, the waiver is invalid and unenforceable.*

**Claim 1.2**

*Defendants must rely on advice of counsel regarding the complexities of statutory language and corresponding legal interpretations. Counsel misadvised Mr. McKnight as to one of the elements of his charge, that is intent, persuading Mr. McKnight that he was guilty based upon counsel's apparent misunderstanding of the law on this point. The liberty and financial consequences of Mr. McKnight's ill-advised plea highlight the harm he suffered because of counsel's unreasonable performance.*

1

§2255
Gregory McKnight
Case No. 4:12-cr-20101-MAG-MJH-1

**Claim 1.3**

*When a defendant cooperates with the government based on a comprehensive immunity agreement negotiated by counsel, the defendant's constitutional protection against self-incrimination is made manifest. Counsel led Mr. McKnight to believe that he was fully immunized prior to 40 months of voluntary cooperation. The government's use of proffered material in preparing an information supporting a criminal charge against him violated that understanding and led to his guilty plea. Counsel's misadvice resulted in irreparable harm against him.*

**Claim 1.4**

*A sentencing court has authority to evaluate substantial assistance provided by a defendant. A court requires sufficient specificity in order to justify a variance based on consideration of the nature and extent of such assistance. Counsel failed to provide the Court with substantial detail, including names and results, that Mr. McKnight's assistance contributed toward. Mr. McKnight's sentence at the top end of his Guidelines range is a consequence of the ineffective assistance he received.*

**Claim 1.5**

*Defense counsel has a duty to investigate and pursue mitigating circumstances that have significant implications at sentencing, especially when his client pleads guilty based on counsel's advice. Counsel also has a responsibility to ensure Guidelines applications follow established prescriptions to maximize his client's benefit. Here, counsel failed to develop available arguments as to the calculation of loss that likely would have resulted in a lower sentence.*

2

§2255
Gregory McKnight
Case No.  Case No. 4:12-cr-20101-MAG-MJH-1

**Claim 1.6**

*Unlike loss calculations dictated by the Guidelines Manual for purposes of establishing a sentencing range, restitution calculations are dictated by Congressional Statute. The former allows for reasonable estimates, the latter does not. Counsel failed to affirmatively pursue a rigorous accounting of the loss amount as it is related to restitution. As a result, the Court determined a restitution amount that was millions of dollars greater than it should have been.*

**Claim 1.7**

*To provide effective assistance, counsel must be aware of controlling case law and its application to the case at bar. Here, counsel failed to object when the Court delegated its authority to determine a restitution payment schedule to the federal Bureau of Prisons (BOP). The resulting penalties assessed by the BOP against Mr. McKnight for failure to meet its schedule is a consequence of ineffective assistance of counsel.*

3

TO THE UNITED STATES DISTRICT COURT

~~FOR THE EASTERN DISTRICT OF MICHIGAN~~

FLINT DIVISION

UNITED STATES.

Appellee

vs.

GREGORY MCKNIGHT,

Appellant

Case No 4:12-cr-20101-MAG-MJH-1

## MEMORANDUM OF LAW

This memorandum is offered in support of, and filed contemporaneously to Mr. McKnight's motion under 28 U.S.C. §2255 as a means to contest his conviction and sentence. Mr. McKnight claims that counsel's performance was deficient, and demonstrates through this vehicle that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted.

### Timeliness and Jurisdiction

Sentence was imposed by this Court on August 6, 2013 after a guilty plea to a single count of wire fraud. 18 U.S.C. §1343. The plea was part of an agreement signed moments before Mr. McKnight's initial appearance on the charge, an appearance that doubled as his Rule 11 hearing. Mr. McKnight's plea agreement included a direct appeal waiver, as well as a general waiver regarding collateral appeal. Nonetheless, Mr. McKnight asked counsel to file a notice of appeal after sentencing.

Appellate counsel, having discovered the plea waiver, filed an Ander's brief with the circuit court. That court gave Mr. McKnight 15 days to file *a pro se* reply, which he scribbled by hand to meet the deadline. The Sixth Circuit denied his appeal in an order dated June 18, 2014.

There was no motion for reconsideration or en banc review. There was no petition for writ of certiorari.

Mr. McKnight filed this Motion to Vacate, Set Aside, or Correct Sentence on September 1, 2015. The motion is filed under cover of 28 U.S.C. §2255 which authorizes this Court to consider errors of constitutional magnitude, as well as non-constitutional errors resulting in a complete miscarriage of justice or violation of due process. See *Watson v. U.S.* 165 F.3d 486, 488 (6th Cir. 1999) (citing *U.S. v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)).

Summary of Argument

Mr. McKnight presents seven claims for the Court's consideration, all originating from his Sixth Amendment right to counsel. However, Mr. McKnight must acknowledge that part of the plea agreement he signed included a waiver to appeal, including any collateral appeal based on §2255. The Sixth Circuit has provided at least two provisions for defendants to contest such waivers: (1) an attack on the guilty plea itself, and (2) a challenge to the knowing and voluntary nature of the waiver specifically. *U.S. v. Bissaco*, 2010 U.S. App. Lexis 27711 (6th Cir.). Mr. McKnight employs both in his first three claims.

Claim 1.1 directly challenges the validity of the waiver based on Mr. McKnight's lack of pertinent knowledge as to the Sixth Amendment implications subsumed within the waivers. Claims 1.2 and 1.3 attack the guilty plea itself based on the constitutionally ineffective assistance provided by counsel. The first attack (1.2) identifies counsel's misadvice as to one of the elements of the crime, while the second (1.3) highlights counsel's misadvice regarding Mr. McKnight's immunity agreement, which ultimately continued to his guilty plea.

With the waiver issued dispatched, Mr. McKnight goes on to bring four more IAC issues. In Claim 1.4, Mr. McKnight demonstrates counsel's failure to adequately inquire as to the fruits of

2

his cooperation in relation to the governments' investigation of others, and the corresponding failure to bring those results to light for the Court's consideration at sentencing the final two claims focus on the loss and restitution portions of Mr. McKnight's sentence.

In Claim 1.5, Mr. McKnight outlines a series of missteps by counsel that resulted in a 22-point enhancement based on an erroneous calculation of loss. Mr. McKnight avers that, even if counsel was unsuccessful in negotiating a reduced loss amount as part of his plea agreement, he would have insisted on going to trial to challenge the issue or, at least, insisted on an evidentiary hearing as part of a plea agreement to settle the dispute.

In Claim 1.6 Mr. McKnight challenges the restitution amount based on a combination of counsel's misadvice (in stipulating to the Factual Basis) and failed promises to pursue a rigorous accounting of the government's numbers.

Lastly, Mr. McKnight illustrates the Court's error — and counsel's corresponding failure to object — in delegating its statutory authority to set a payment schedule for restitution during his incarceration.

While these final four claims tackle questions as an alternative to the potentiality of the Court's denial in vacating his conviction, Mr. McKnight presents a well-reasoned discourse as to why his conviction for wire fraud should be overturned

## IAC Standard of Review

The Sixth Amendment right to effective assistance of counsel encompasses the right to effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970). This right additionally extends to the plea bargaining process. Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012).

3

A petitioner pursuing IAC claims bears the burden of showing (1) that counsel's performance fell below objective standards for reasonable effective representation, and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *see also Mallet v. U.S.*, 334 F.3d 491, 497 (6th Cir. 2003).

To satisfy the first of these two prongs, the defendant must direct the court to specific acts or omissions of counsel. (1) *See Workman v. Bell*, 160 F.3d 276, 287 (1998). The court must then consider whether, in light of all the circumstances, counsel's performance was outside the wide range of professionally competent assistance. *See O'Harra v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). The court's review of counsel's performance must be "highly deferential[,] ... indulg[ing] a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Strickland*, 466 U.S. at 689.

Finally, the reviewing court need not speculate whether a different strategy might have been more successful, "but, instead, focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Nichols v. U.S.*, 563 F.3d 240, 249 (6th Cir. 2009).

As a *pro se* litigant, Mr. McKnight asks for the Court's indulgence in its review of his filings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*Pro se* complaints held to less stringent standards than formal papers drafted by lawyers). In articulating his arguments, Mr. McKnight attempts to provide support with available case law, but is restricted by the limited resources at his disposal. *Ratliff v. U.S.*, 999 F.2d 1023, 1026 (6th Cir. 1993).

Edward Wishnow, Esq., was appointed by this Court to represent Mr. McKnight through sentencing; for purposes of this brief, Mr. Wishnow is simply referred to as "counsel", "defense counsel" and/or "trial counsel".

4

Arguments

## Claim 1.1

*The waiver of a constitutional right can be valid only if the defendant knows what right he is giving up and has a reasonable understanding of the consequences of the loss of that right. Counsel never explained to Mr. McKnight that his collateral appeal waiver included his Sixth Amendment right to effective assistance of counsel, or its corresponding implications. As a result, the waiver is invalid and unenforceable.*

A collateral appeal under §2255 is a statutory right, not a constitutional one. However, the right to effective assistance of counsel — as well the corresponding right to test the constitutional effectiveness of that assistance — is. Like most constitutional rights, this Sixth Amendment guarantee may be waived. See *U.S. v. Fleming,* 239 f.3d 761, 763 (6th Cir. 2001). However, waiving a constitutional right must be a knowing, intelligent, and voluntary act. See Hill v. Lockhart, 474 U.S. 52, 56 (1989).

Neither counsel, nor this Court, advised Mr. McKnight that his Sixth Amendment right was subsumed within the waiver that he signed. The collateral appeal waiver in his plea agreement was shrouded in ambiguity and legalese.[1]

To the uninitiated, the term "collateral" has multiple meanings. For a defendant, like Mr. McKnight, whose background and experience is in business investments and real estate, the term has a decidedly non-legalistic connotation. And, the phrase "28 United States Code, Section 2255" is about as clear as a numerology reading in a fortune teller's tent at a county fair. Plea Transc.; p. 23/n. 21-22.

---

[1] "Defendant understands that defendants generally have the right to attack their convictions and sentences by filing post-conviction motions, petitions, or independent civil actions. As part of this agreement, however, defendant knowingly and voluntarily waives that right and agrees not to contest his conviction or sentence in any post-conviction proceeding, including — but not limited to — any proceeding under 28 U.S.C. §2255."

5

Nevertheless, Mr. McKnight applied a layman's logic and common sense reading to the waiver and interpreted it to mean that he couldn't repeatedly appeal his sentence simply because he was unhappy with the outcome.

Counsel never advised him that the waiver would eliminate his right to challenge his attorney's competency in giving legal advice during his criminal proceedings. (Exhibit 1; p. 5/n. 21.) (Exhibit 2; p. 1/n. 8). Had he known this, he would never have signed the agreement as written. (Exhibit 1; p. 5/n. 21).

At his Rule 11 hearing, the Court asked Mr. McKnight if he understood the waiver. Plea Transc.; p. 23/n. 22). Mr. McKnight answered in the affirmative because he thought he did understand it. (Plea Transc.; p. 23 /n. 23). But, the Court never tested that understanding and , importantly, never extricated the IAC implications of the waiver and its corresponding Sixth Amendment rights for Mr. McKnight's education. This stands in stark contrast to the Court's thoroughness in ensuring Mr. McKnight's understanding of other constitutional rights. (Grand Jury waiver; Plea Transc.; p. 6-7) (Jury Trial waiver; Plea Transc.; p. 24-25) (Confront Witnesses waiver; (Plea Transc.; p. 25/n. 19-21) The Court even took time to enumerate various civil rights that Mr. McKnight was abandoning as a result of his voluntary guilty plea. Plea Transc.; p. 24/n. 5-9.

Importantly, the Court explicitly distinguished Mr. McKnight's constitutional right to the assistance of counsel at trial (Sent. Transc.; p. 25/n. 13-21). Sandwiched in the middle of the Court's description of his right to counsel at trial was the phrase "indeed at every stage of the proceedings to have the right to the assistance of counsel. (Sent. Transc.; p. 25/n. 15-16). Mr. McKnight interpreted the context of the Court's illumination here to mean that he was only

6

giving up his right to effective assistance of counsel as it pertained to the proceedings of a jury trial.

For these reasons, Mr. McKnight argues that his collateral waiver as it specifically relates to his claims under the umbrella IAC ground was unknowing and involuntary, consequently invalid and unenforceable. Mr. McKnight is hopeful that the government will affirmatively waive any objection to his IAC claims by implementing the U.S. Attorney General's directive on the subject, issued October 14, 2014.[2]

By finding in Mr McKnight's favor on this claim, the Court clears the way for a thorough and unhindered review of the merits presented in his remaining six claims. Should the Court find otherwise, Mr. McKnight asks that the Court issue a certificate of appealability on this claim for a review by the Sixth Circuit, because it is a question that reasonable jurists would disagree on.

**Claim 1.2**

*Defendants must rely on advice of counsel regarding the complexities of statutory language and corresponding legal interpretations. Counsel misadvised Mr. McKnight as to one of the elements of his charge and that is intent, persuading Mr. McKnight that he was guilty based upon counsel's apparent misunderstanding of the law on this point. The liberty and financial consequences of Mr. McKnight's ill-advised plea highlight the harm he suffered because of counsel's unreasonable performance.*

A defendant who has made an affirmation of voluntariness and has pleaded guilty carries a heavy burden in subsequently claiming that his plea was involuntary. Nevertheless, such

---

[2]Criminal Law Reporter Vol. 96, No. 4, pg. 115
The memo also directs prosecutors not to enforce counsel-ineffectiveness waivers in existing plea deals "when defense counsel rendered ineffective assistance resulting in prejudice" or "when the defendant's ineffective assistance claim raises a serious debatable issue that a court should resolve."

statements do not represent an absolute bar to post-conviction relief. *Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977), "In administering the writ of habeas corpus and its §2255 counterpart, the federal courts cannot fairly adopt a *per se* role excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." *Id.*

It could be argued that a defendant who pleads guilty acts as his own jury. When that defendant bases the determination of his own guilt on an erroneous instruction — provided by counsel — as to an element of the crime, the guilty plea itself is invalid. See, cf., *U.S. v. Ross*, 40 F.3d 144 (7th Cir. 1994 )(§2255 relief granted when it determined that the jury in movant's trial was erroneously instructed with respect to the *mens rea* element of the offense). In order to obtain relief, a prisoner who is challenging the entry of his guilty plea on the basis of IAC must first show that counsel's advice was not within the range of competence demanded of attorneys in criminal cases. *Sparks v. Sowders*, 852 F.2d 882, 884 (6th Cir. 1988).

When an attorney fails to inform his client of the relevant law, such a failure satisfies the first prong of the *Strickland* analysis, *Hill v. Lockhart*, 474 U.S. 52, 62 (1985) (White, J., concurring). "By proffering material, but erroneous legal advice, counsel perform[s] below the constitutional guarantee [of effective assistance]". *Swain v. U.S.*, 155 Fed. Appx. 827,831 (6th Cir. 2005).

However, an error committed by counsel, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," *Strickland v. Washington*, 466 U.S. 668, 691 (1984). To successfully challenge a guilty plea on the ground of IAC, the petitioner must show a reasonable probability that, but for

counsel's errors, petitioner would not have pleaded guilty and would have insisted on going to trial. *Hill, supra; Nagi v. U.S.,* 90 F.3d 130, 134 (6th Cir. 1996).

Mr. McKnight claims that counsel misadvised him as to one of the key elements of his charge, of which there are three. "The first element of wire fraud [ ... ] is that the defendant devised or willfully participated a scheme to defraud. The second is that he used or caused to be used an interstate wire communication 'in furtherance of the scheme;' the third, that he intended 'to deprive a victim of money or property.'" *U.S. v. Faulkenberry,* 614 F.3d 573, 581 (6th Cir. 2009) (citing *U. S. v. Prince,* 214 F.3d 740, 748 (6th Cir. 2000)). It is this third portion, the intent or *mens rea* element, which is the impetus for Mr. McKnight's claim.

There appears to be no question in the record that Mr. McKnight initially devised a legal enterprise, one that depended on the internet to communicate with clients. At sentencing, counsel described for the Court a "well-intentioned" motive in the beginning, illustrating that — at least initially — there was no intent to defraud. (Sent. Transc.; p. 14/n. 12-17). The government later agreed with counsel's assessment, saying that Mr. McKnight started his venture with the best of intentions. (Sent. Transc.; p. 20/n. 12-15). Even the Court acknowledged this bi-partisan assessment of Mr. McKnight's initial intentions "not to defraud." (Sent. Transc.; p.27/n. 5-8).

At some point, although exactly when is never clearly defined, that intent is said to have changed. Mr. McKnight steadfastly insisted to counsel that his intent never changed; that he affirmatively intended to operate a business based on a premise of investing money derived from loans that would provide ample returns to pay promised interest rates on those loans. (Exhibit 1; p. 1/n. 4.) Mr. McKnight repeatedly asked counsel how the government could possibly prove that what he had done constituted any attempt to defraud when his goal from

9

beginning to end was always to make his "members" whole. (Exhibit 1; p. 3/n. 14.) Counsel's limited response was "because you lied on your website." Counsel never gave Mr. McKnight a more detailed explanation of the intent element. (Exhibit 1; p. 5/n. 21).

Accordingly, Mr. McKnight suggests that counsel misunderstood the intent element, and that he must have been unaware of existing case law on the issue at the time he advised Mr. McKnight to plead guilty.

"Wire and mail fraud are specific intent crimes, requiring the government to prove *not only* that [the defendant] knowingly made a false misrepresentation or knowingly omitted a material fact, but also did so with the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *U.S. v. Ediger,* 166 Fed. Appx. 218, 223 (6th Cir. 2006) (emphasis added) (citing *U.S. v. Daniel,* 329 F. 3d 480, 487 (6th Cir. 2003)). In other words, "to convict a person of defrauding another, more must be shown than simply an intent to lie to the victim or to make a false statement to him [ ... ] to be convicted of mail fraud or wire fraud, a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value. *U.S. v. Wynn,* 684 F3d 473, 478 (4th Cir. 2012). "Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *U.S. v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir. 1994).

Whether counsel was aware of existing case law at the time, or simply failed to inform his client on its merits, Mr. McKnight was misadvised. This misadvice is further evidenced by counsel's error in not informing Mr. McKnight of the availability of a corresponding "good-faith" defense. A good faith defense is limited to very narrow circumstances in the Sixth Circuit, indeed all circuits. Pattern jury instructions say it is only to be used "in mail fraud and

10

wire fraud or bank fraud, "which require proof of specific intent to defraud. See

*U.S. v. Svoboda,* 633 F3d 479, 482-83 (6th Cir. 2011). Although good faith is a complete defense

to the charge of wire fraud, defendants must provide evidentiary support for such a good faith

defense. See, c.f. *U.S. v. Ash,* 117 F.3d 1421 (6th Cir 1997). It is not enough for a defendant to

claim a good-faith defense, he must present an affirmative case for it buoyed by supporting

evidence. See *U.S. v. Tarwater,* 308 F.3d 494, 510 (6th Cir. 2002).

In summary, while the various figures the government alleges were in fact offered to

Mr. McKnight's "members" and potential "members" reflect the evolving nature of the offers

made and are thus taken out of context.

Moreover, Mr. McKnight asserts that intent to defraud as an element of wire fraud naturally

infers an intent for personal financial gain.

Certainly Mr. McKnight paid himself a salary for managing the enterprise he started. All

parties agree that this enterprise was legitimate in its earliest stages. Because the exact point

where this legitimate enterprise became a criminal exercise has never been unequivocally

established as a fact by the Court — therefore, an issue in contest. [3]Likewise, there is no

established demarcation as to what portion of the enterprises' collected funds were spent for

---

[3] Mr. McKnight acknowledges that the plea agreement and the Information proffered by the government in support of the charge, describe, "from December 2005 to at least November 2007." as the dates of the alleged "scheme." Plea Agreement; p. 3/¶ 1; DE 1; p. 2/n. 8. However, Mr. McKnight avers that counsel explained to him that this "simply" established, as a matter of fact, the total existence of his company, Legisi. Accordingly. Mr. McKnight had no reason to object to the dates he consented to in signing the agreement to plead. Mr. McKnight further asserts that the factual observations by counsel, the government and this Court at sentencing support his proposition that the precise dates as to when Mr. McKnight's enterprise became an illegal scheme is fuzzy at best. Lastly, Mr. McKnight draws attention to the governments allegation at sentencing as to its generic attribution of "within a month or two" (Sent. Transc.; p. 20/n. 19-20) is factually impossible. The Legisi website went live in December 2005 (month one), but didn't receive any funds prior to mid-January 2006 (month two) and didn't begin investing those funds before late January 2006. Exhibit 1; p. 1/n. 4. Surely the government doesn't suggest that the results of those investments (profit or loss) were immediately known , or could have been known in less than 90 days.

11

"personal use" during the company's legitimate operation versus after it became an illegal scheme.

The government contends that $2.2 million was identified as being used "to pay personal expenses," while providing the Court with inadequate detail in its accounting method used to classify the monies as such (Plea Argmnt.; p. 4/¶ 4 and p. 5/¶ 1). Mr. McKnight addresses the few specific line items alleged by the government, showing their origins as legitimate business expenses. (Exhibit 1; p. 5/n. 22). But, without more, he is at a disadvantage to challenge the government's unfounded (in the record) assertions — an issue Mr. McKnight raised with counsel, to no avail. (Exhibit 1; p. 5/n. 22).

Ultimately, all "personal" expenses associated with Mr. McKnight as the sole proprietor/ shareholder of a legitimate enterprise would have been identified and acknowledged at trial as reasonable with the assistance of a corporate compensation expert. Mr. McKnight suggests that this would have been an important part of his defense. But, he believes that this issue is secondary to the good-faith defense specifically, because a good-faith application itself confers legitimacy on the overall history of the company.

In sum, Mr. McKnight asserts that counsel advised him to plead guilty because the government could prove all three elements. Mr. McKnight asserts that when he questioned counsel on the issue of intent, based upon a genuine belief that his intent had always been to honor the pledges he made in the operation of the enterprise, counsel's response was to say none of that mattered "because you lied on the website."

Furthermore, Mr. McKnight avers that counsel never advised him as to the possibility of any affirmative defense strategies if he should decide to go to trial instead of pleading guilty.

Because counsel advised him that he was guilty and had no other option than to plead guilty, Mr. McKnight followed counsel's advice. Mr. McKnight emphatically asserts that had counsel advised him accurately as to the element of intent — in relation to his repeated questioning on the issue and to the availability of the established good-faith defense strategy, he would not have pled guilty, but instead would have insisted upon going to trial.

As a result, Mr. McKnight asks the Court to vacate his conviction and return him to the pre-plea stage of his proceeding. In the alternative, Mr. McKnight asks the Court to schedule an evidentiary hearing to explore and test his assertions. In so doing, Mr. McKnight additionally asks the Court to appoint counsel in a timely fashion so that he can adequately prepare.

**Claim 1.3**

*When the defendant cooperates with the government based on a comprehensive immunity agreement negotiated by counsel, the defendant's constitutional protection against self-incrimination is made manifest. Counsel led Mr. McKnight to believe that he was fully immunized prior to 40 months of voluntary cooperation. The government's use of proffered material in preparing an Information to support a criminal charge against him violated that understanding and led, in pertinent part, to his guilty plea. Counsel's misadvice resulted in irreparable harm against him.*

In 2008, Mr. McKnight was arrested and arraigned on a single count of wire fraud supported by an Affidavit. (Exhibit 3 (2008 Affidavit). The Court appointed counsel for his criminal case. The charge was dismissed without prejudice by motion of the government. Subsequently, upon advice of court appointed counsel, Mr. McKnight signed an immunity agreement and began cooperating with the government. In 2012, upon advice of same counsel,

13

Mr. McKnight acquiesced to a guilty plea to the same charge, supported by an Information

stemming from his cooperation. DE 1 (2012 Information).

Immunity statutes seek a balance between the imperatives of constitutional privilege and

the legitimate demands of government to compel citizens to testify. *Kastigar v. U.S.*, 406

U.S. 441, 446 (1972).

> "The existence of these statutes reflects the importance of testimony, and the fact
> that many offenses are of such a character that the only person capable of giving
> useful testimony is the one implicated in the crime. Indeed, their origins were in the
> context of such offenses, and their primary use has been to investigate such offenses."
> [4]*Kastigar*, 406 U.S. at 446-47.

Congress has enacted immunity statutes 18 U.S.C. §§6002-6003 for this very purpose, as a

tool to force testimony in order to discover facts in an ongoing investigation so that decisions can

be made as to the prosecution of an individual or individuals. The alternative result, of course, is

that the discovered facts lead to a conclusion that no criminal law has been violated and the close

of the investigation, thus conserving valuable resources.

Transactional immunity, deriving its name from the language found in the Compulsory

Testimony Act of 1893[5], was the basis of numerous federal immunity statutes through 1970.

That's when Congress enacted §6002, which subsequent Supreme Court decisions elaborated on

to find that immunity from the use of compelled testimony and evidence *derived* therefrom is

coextensive with the scope of the [Fifth Amendment] privilege. *"Kastigar*, 406 U.S. at 452-53.

Thus, "derivative immunity" became part of the lexicon of American jurisprudence.

---

[4]"Immunity statutes have for  more than a century have been [sic] resorted to for the investigation of many
offenses, chiefly those whose proof and punishment were otherwise impracticable, such as [ ... ] consumer
frauds." *Kastigar*, 406 U.S. at 447, n.15 (internal quotation marks omitted).
[5]"[N]o person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any *transaction,
matter or thing*, concerning which he may testify, or produce evidence, documentary or otherwise ..." *Kastigar*,
406 U.S. at 451.

14

Derivative immunity refers to the collateral "fruits" of compelled testimony. "[I]mmunity from use and derivative use leaves the witness and the Federal Government in substantially the same position as if in the absence of a grant of immunity. "*Id.* at 458-59. In other words, when both parties agree to immunize an individual giving testimony — or cooperation — related to an investigation that covers both "use and derivative use" information, it is the same as if the government had granted immunity under one of the existing statutes in order to compel that same testimony cooperation. In both instances the government gains valuable information it might not have otherwise discovered.

But here, the government originated no such compulsion upon Mr. McKnight. Mr. McKnight repeatedly refused to answer questions by the SEC during its civil suit investigation, following civil counsel's advice to stand on his Fifth Amendment rights. (Exhibit1; p. 2/n. 8). Despite this, neither the SEC nor any other governmental agency or department came forward with a grant of immunity proposal. Mr. McKnight suggests this was based on the government's belief, at the time, that he had acted entirely on his own in devising a scheme to defraud unsuspecting investors.

Several months after the unproductive SEC interview, all of Mr. McKnight's business assets and records were seized by order of the court handling the SEC's civil suit. Two weeks later, Mr. McKnight was arrested at his home. He was arraigned and bonded out the same day. The magistrate ordered appointment of criminal counsel. Mr. McKnight spoke directly with the AUSA, briefly, both before and after the arraignment. (Exhibit 1; p. 3/n. 13). And still no suggestion of a grant of immunity. A month later, Mr. McKnight discovered — quite by accident — that the criminal charge had been dismissed within days of his arraignment. (Exhibit 1; p. 4/n. 16).

15

Shortly thereafter, Mr. McKnight received a phone call from his Court appointed counsel. When they met, counsel informed Mr. McKnight that although the charge had been dismissed without prejudice, the government's investigation was still going on. (Exhibit 1; p. 4/n. 16). When he asked counsel how it was that the Court was still paying him to represent Mr. McKnight even though there were no charges pending, counsel simply told him it was a "complicated matter." (Exhibit 1; p. 4/n. 16). Mr. McKnight understood this to mean that the dismissal of the charge was a legal technicality, and that because counsel was representing him at the behest of the Court as a direct result of that charge, his constitutional liberty and rights were still in peril.

Accordingly, Mr. McKnight asked counsel about the possibility of an immunity agreement with the government in exchange for his cooperation. (Exhibit 1; p. 4/n. 17), Mr. McKnight's motive was to help the government recover monies for the alleged victims, an issue of concern since the seizure. (Exhibit 1; p.4/n. 17). To be clear, Mr. McKnight's motive was not entirely altruistic as he was hopeful that full recovery would potentially lead to the government dropping its pursuit of criminal recompense. (Exhibit1; p.4/n.17). To be equally clear, Mr. McKnight was firm in his belief that he had done nothing illegal, but he was nevertheless anxious to protect himself from what he believed to be the vagaries of the law. (Exhibit 1; p. 4/n. 17). His experience with the SEC meeting, and civil counsel's affirmative advice to vigilantly protect his rights, taught him to distrust the government. (Exhibit 1; p. 4/n. 16). Counsel agreed to broach the subject with the government on Mr. McKnight's behalf.

Several months later, counsel told Mr. McKnight that he had an immunity agreement. (Exhibit 1; p. 4/n. 18). Counsel told him that the agreement would protect him from the

16

government using "anything he said" against him.( Exhibit 1; p. 4/n. 18). Given Mr. McKnight's original discussion with counsel on the subject months earlier, he interpreted counsel's description as giving him complete immunity based on any information he provided in his ensuing cooperation. (Exhibit 1; p. 4/n. 18).

Counsel never discussed legal nuances contained in the agreement as it referred to "use" versus "derivative use." (Exhibit 1; p. 4/n. 18).Counsel never indicated that the agreement he was advising Mr. McKnight to sign, represented anything other than what Mr. McKnight had originally proposed to counsel. (Exhibit 1; p. 4/n. 18).

Additionally, during this period of time, from several weeks before his arrest through to just before sentencing, Mr. McKnight was taking the prescription medication Xanax to counter symptoms of severe anxiety and depression associated with the demise of what he had considered to be a legitimately successful business and his subsequent legal troubles.

Unlike plea agreements which necessarily require a defendant to abdicate multiple rights associated with a guilty plea, voluntary immunity agreements require no judicial review to ensure the defendant's Fifth Amendment rights are both understood and adequately protected before the agreement is perfected and implemented. Instead, the supreme Court fashioned a post-agreement test whereby "federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence," *Kastigar*, 406 U.S. at 460. (Internal quotation marks and citation omitted). This solution, now commonly referred to as a *Kastigar* hearing, first requires the court to find that agreement itself is valid, even before determining the type of immunity protections the agreement spells out. Mr. McKnight proposes that the test of validity for such an agreement is

17

similar to that used for plea agreements; that is, was the defendant's consent to the agreement

knowing, intelligent, and voluntary. In support:

> "That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. *He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so — hence the minimum requirement that his plea be the voluntary expression of his own choice.* But the plea is more than an admission of past conduct, it is the defendant's consent that judgment of conviction may be entered without a trial — a waiver of his right to trial before a jury or a judge. *Waivers of constitutional rights must be knowing, intelligent acts done with a sufficient awareness of the relevant circumstances and likely consequences."* Brady v. U.S., 397 U.S. 742, 748 (1970) (emphasis added); U.S. v. Webb, 403 f.3d 373, 378 (6th Cir. 2004) (in accord) (emphasis added).

Mr. McKnight concedes there are various differences between a guilty plea and an

immunity agreement, the most obvious being that one comes at the end of the government's

investigation and the other, as here, nearer the beginning. For this reason, the government will

likely argue that Mr. McKnight's Sixth Amendment right to counsel had not attached since

Mr. McKnight was not under indictment at the time the agreement was struck.

It is well settled in the Sixth Circuit that a defendant's Sixth Amendment right to counsel

doesn't generally attach pre-indictment. *U.S. v. Beasley,* 2014 U.S. Dist. Lexis 79768

(E.D. MI) (Because right to counsel does not attach pre-indictment, defendant had no access to

constitutional relief stemming from conflict of interest by counsel during grand jury stage). See

also *U.S. v. Myers,* 123 f.3d 350, 359 (6th Cir. 1997) (concluding that, although the defendant

had been "a target when he appeared before the grand jury," he "had not been formally charged,

"and thus" his Sixth Amendment right to counsel had not yet attached.").

"The Sixth Circuit decision in *Moody* [ ... ] illustrates the Sixth Circuit's position on when

the right to counsel attaches." *U.S. v. Genao,* 2010 U.S. Dist. Lexis 82536 (E.D. MI). In *Moody,*

the defendant rejected a plea offer from the government based on the misadvice of retained

18

counsel. The district court found the misadvice had met the *Strickland* standard for ineffective assistance of counsel and granted collateral relief. But on appeal by the government, the Sixth Circuit reversed because the plea offer and corresponding advice preceded any formal charges against the defendant, thereby negating any Sixth Amendment claim. *U.S. v. Moody,* 206 f.3d 609 (2000).

*Moody,* in turn, relied on numerous Supreme Court decisions, the most important arguably being *Kirby v. Illinois,* 406 U.S. 682 (1972). There, the court reiterated that it is firmly established that a person's Sixth and Fourteenth Amendments right to counsel attaches only at or after the time that adversarial judicial proceedings have been initiated against him. *Id,* at 688. The case revolved around witness identification pre-indictment.

But one underlying fact distinguishes Mr. McKnight's claim from all of these: the misadvice he received was from a court appointed, CJA attorney. In *Kirby,* the defendant had no counsel, court appointed or otherwise, when the alleged problem occurred. Had the district court in that case appointed counsel prior to the witness's identification, the court would have wanted to examine the circumstances that left to the district court's actions. For such an order implies that the defendant had at least appeared before the district court in a setting commensurate with a critical stage in the criminal process. Likewise, in *U.S. v. Fowler,* 535 f.3d 408 (6th Cir. 2008), the defendant had no representation to advise him of his Fifth Amendment right against self-incrimination prior to being charged. Accordingly, as the *Beasley* decision notes, the defendant had no right to counsel at the time, and had been appropriately advised of his Miranda rights. Importantly, the Fowler court wrote that "the Sixth Amendment right to counsel attaches only at or after the initiation of adversary judicial proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.,* at 416.

19

It is just this type of event that instigates court appointment of counsel for indigent defendants, like Mr. McKnight. See *Powell v. Alabama*, 287 U.S. 45 (1932) and *Gideon v. Wainwright*, 372 U.S. 335 (1963). Mr. McKnight reminds the Court that it appointed the attorney in question here, not once, but twice. The first time was May 19, 2008 when the first charge and Mr. McKnight's arrest occurred. The second time was March 5, 2012 at the time of Mr. McKnight's plea hearing. According to Docket Entry # 8, that appointment was made retroactive to February 16, 2012.

Mr. McKnight asserts that court appointed counsel's representation, as authorized by the Court, was continuous from Mr. McKnight's first charge/first information/first arraignment through to sentencing. Because Mr. McKnight believed that counsel's representation was a continuation of his initial criminal proceeding in 2008 he followed counsel's advice in signing what counsel called a *"Kastigar"* agreement, and then fully cooperated with the government.

Any argument challenging Mr. McKnight's IAC claim by asserting that his right to counsel had not yet attached at the time the advice was given, would necessarily have to rely on the previously cited case law. But as previously shown, most of those cases involved circumstances where defendants had no representation at the time. In others, like *Moody*, the defendant was represented by retained counsel. Likewise, in other Supreme Court decisions defining a critical stage of the criminal process for purposes of determining a constitutional right to counsel trigger, the defendants had paid counsel out of their own pockets. See *Wood v. Georgia*, 450 U.S. 261 (1981); *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

In fact, Mr. McKnight has not been able to discover a single published case, be it from the Supreme Court or in any circuit in the country citing like circumstances that is, an IAC claim

20

exclusively involving court appointed counsel that was found to be meritless based on a determination that the defendant's Sixth Amendment right to counsel had not yet attached.

Mr. McKnight queried counsel on the dismissal of his 2008 charge and its implications for counsel's continuing representation, only to be told that it's complicated. (Exhibit 1; p. 4/n. 16). Mr. McKnight believed counsel had negotiated the cooperation agreement under the guise of that continuing representation by right of his Sixth Amendment guarantee. Mr. McKnight also believed that counsel's consistent appearance at each of the proffer meetings with the government over the next few years was further evidence of his Sixth Amendment protection. As a result, Mr. McKnight was lulled into believing that his constitutional right to counsel as explained to him by the Magistrate Judge at his 2008 arraignment continued without interruption as a consequence, Mr. McKnight believed that counsel's representation was provided by the Court as a means of ensuring his constitutional right to effective representation during what he understood to be a continuing criminal proceeding from his original arrest and arraignment in 2008 through to his sentencing in 2013.

Accordingly, it was this state of mind that contributed to Mr. McKnight's trust in counsel's advice to sign the agreement and cooperate fully with the government. As previously stated, Mr. McKnight also believed that his so-called *"Kastigar"* agreement provided full immunity as to any information he provided the government, based on counsel's explanation of the document.( Exhibit 1; p. 4/n. 18).

Only when he first read the government's Information in support of the charge, did Mr. McKnight begin to question the value of the agreement. Mr. McKnight pointed out to counsel that the government used information he had given in his proffer meetings as evidence to support the wire fraud charge.( Exhibit 1; p. 5/n. 22), Counsel's response was that the

21

government probably would have discovered that information anyway.[6] (Exhibit 1; p. 5/n. 22).
Again, Mr. McKnight trusted his attorney's counsel.

But, then on appeal, appellate counsel advised Mr. McKnight for the first time that what he signed was not a "Kastigar" agreement, but instead something called a limited use immunity agreement. (Exhibit 1; p. 4/n.27). Furthermore, appellate counsel explained that the agreement absolutely did not prevent the government from using the information to obtain derivative evidence ultimately determined the issue was moot anyway because Mr. McKnight had signed a direct appeal waiver. (See Anders Brief; p.2; ¶2 filed on December 23, 2103)

Mr. McKnight now raises the issue, on §2255, that counsel's misadvice led to his giving the government information that it later used against him to prove an element of the crime he was charged with. That misadvice to self-incriminate, rises to the level of constitutionally ineffective assistance of counsel.

Mr. McKnight asserts that, were it not for the misadvice as to the immunity agreement, he never would have signed it, let alone cooperated. Without his cooperation, the government would not have discovered the banking data evidence it used to prove an element of the charge. Accordingly, Mr. McKnight would never have agreed to plead guilty in the first place.

Mr. McKnight reiterates that it was he — not the government and not counsel — who first raised the idea of an immunity agreement, a full immunity agreement. Additionally, Mr. McKnight reminds the Court that he had previously refused to cooperate with the government (SEC) in its investigation in the civil case. Mr. McKnight firmly believes that the transaction data from a long since closed and short-lived bank account that the government used

---

[6] Mr. McKnight asserts that the government would not have discovered the wire transaction involving First Third Bank without his proffer, because that particular information was not in the materials that the government had seized through the execution of its search warrant.

in the Information would never have been available had he not provided it. Lastly, Mr. McKnight emphasizes the fact that he repeatedly affirmed his innocence to counsel until counsel convinced him to plead guilty based, in part, on misadvice as to the intent element of the crime. Even at sentencing, Mr. McKnight couldn't bring himself to proffer an allocution that admitted to something that he believed amounted to a legal technicality (the intent element as defined by counsel).

For the foregoing reasons, Mr. McKnight asks the Court to vacate his guilty plea and restore his status to that where he found himself in 2008 after the initial charge of wire fraud had been dismissed.

**Claim 1.4**

*A sentencing court has authority to evaluate substantial assistance provided by a defendant. A court requires sufficient specificity in order to justify a variance based on consideration of the nature and extent of such assistance. Counsel failed to provide the Court with substantial detail, including names and results that Mr. McKnight's assistance contributed toward. Mr. McKnight's sentence at the top end of his Guidelines range is a consequence of the ineffective assistance he received.*

Although departures under §5K1.1 require a motion from the government, variances do not. *U.S. v. Blue,* 557 f.3d 682, 687 (6th Cir. 2009).

"'Departure' is a term of art under the Guidelines and is distinct from "variance.'" *U.S. v. Blackie,* 548 f.3d 395, (6th Cir. 2008). As an example, a Guidelines "departure" refers to the imposition of a sentence outside the advisory range. A departure results from a district court's application of a particular Guidelines provision such as §4A1.3 or §5, Part K. *U.S. v. Smith,* 474 f.3d 888, 896 (6th Cir. 2007) (Gibbons, J., concurring). A "variance"

23

describes the selection of a sentence outside the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors found in §3553(a). *Id.*

Mr. McKnight's sentence fell within the calculated Guidelines range, albeit the top end of that range. There was no deviation. Furthermore, the Court iterated its consideration of §3553(a) factors, based on the available record, in determining Mr. McKnight's term of incarceration. So, on what basis does Mr. McKnight establish a claim sounding of an unreasonable sentence, when the sentence fell within the unchallenged Guidelines range?

As is consistent with most ineffective assistance claims, the issue is what the record doesn't show. Mr. McKnight asserts that his nearly five years of cooperation contributed to the government's investigation or prosecution of one or more associates. The list includes, but may not be limited to, the following:

> Matthew Gagnon — Mr. McKnight's mentor in developing his online loan/investment enterprise; co-promoter of Legisi through his own company — Mazu.

> Doug Skordal — Mr. Gagnon's second in command at Mazu (and former brother-in-law) was instrumental in coordinating referrals to Legisi. (Unknown outcome)

> Martin Langley — Another Mazu employee who was instrumental in selling Mazu members on the value of Legisi. (Unknown outcome)

> Mary Klein — Mr. Gagnon's executive assistant at Mazu whose support in the promotion of Legisi was part of the referral "partnership" between the two companies. (Unknown outcome)

> Jeff Kinseth — Also mentored by Mr. Gagnon, used his own "Legisi-like" business to coordinate investments through Legisi. (Arrested in 2013 in association with Mr. Gagnon; unknown outcome)

> Russel Savage — Primary currency exchange trader for Mr. Kinseth. (Outcome unknown)

> Jamie Duncanson — Independent broker working through a company called ComTrust; exclusively managed five accounts: all five associated with Legisi. (see below)

24

William Cordo — An associate of Ms. Duncanson; a convicted felon in connection with money laundering. (see below)

Eric Bloom, Alan Goddard, and Michael Lichtenstein — Principles at Sierra-Equity, Inc., the stock brokerage firm in Florida that was the target of the court-appointed receiver's litigation action to recover assets fraudulently obtained from Mr. McKnight on behalf of Legisi. (Outcome unknown)

Mr. McKnight lacks the resources to research these parties, and others, as they relate to subsequent investigations and possible litigation including any criminal activities. However, Mr. McKnight points out for the Court preliminary results for some that were either part of the existing record or, at least, part that the discovery counsel had at his disposal.

Beginning with Mr. Gagnon, we know from a cryptic footnote in the government's Sentencing Memorandum that he "heavily promoted the Legisi program on his own website, Mazu.com" and "is currently charged by way of criminal complaint in the Eastern District of Michigan for his involvement in the Legisi scheme." Gagnon was later sentenced July 9, 2013 to five years based, in pertinent part, on his assistance in orchestrating the scheme with Mr. McKnight.[7]

The Court may not know that the SEC singled out Mr. Gagnon for further fraudulent activities in its civil case (No. 10-cv-11891; E.D. MI). (Exhibit 4). The SEC's civil complaint additionally accused Mr. Gagnon of extortion that could only have come originally from Mr. McKnight's proffered testimony.[8] (Exhibit 4; p.20/n. 23-26); Mr. McKnight asserts that the information he provided the government through his proffer meetings led to Mr. Gagnon's civil and criminal investigations, as well as to that of Mr. Skordal and other Mazu personnel.

[7]SEC website press release; July 11, 2013.
[8]Gagnon then attempted to extort money from McKnight [....] The next day, Mr. McKnight transferred $61,698 [....] to the [....] account of Gagnon's office manager. (p. 20/n. 123-24). Gagnon's efforts at extorting money from McKnight were not limited to e-mail. Early the morning of November 26, 2007, Gagnon, Skordal, and another man arrived unannounced at McKnight's home and demanded he pay them the remainder of what they claimed he owed them." More wire transfers followed. (p. 20/n. 126).

25

Likewise, Ms. Duncanson almost certainly came to the government's attention exclusively through Mr. McKnight's cooperation. From one of the Secret Service's investigative reports (Exhibit 5) produced in relation to Mr. McKnight's continuing assistance:

> At the 11/21/08 Proffer Meeting, Mr. McKnight told the government about Ms. Duncanson —

> "Griseman [a broker at Hamilton-Chase] told McKnight that Jamie Duncanson was a broker there [at ComTrust], and a good friend." (p. 4/ ¶ 3)

> "McKnight said Duncanson did not work directly for ComTrust, but rather through it as an independent broker. He claimed Duncanson never loaned him or Legisi money, nor did he ever tell her about what his company did. When McKnight hired Duncanson as his broker ..." (p. 4/¶ 4)

> In notes pertaining to the following proffer meeting on 11/25/08 —

> "On 12/5/08, RAIC Zloto [Secret Service] had a telephonic meeting with [staff from] the National Futures Association (NFA) [....] [They] conducted an extensive investigation into Jamie Duncanson of ComTrust. After the meeting, RAIC Zloto sent a letter requesting that the NFA share information with this Service concerning Jamie Duncanson ..." (p. 7/¶2)

> The results of the NFA's investigation are summarized in the report's continuing pages, including —

> "[NFA Staff] told us that NFA filed a civil suite (sic) against Duncanson because she failed to file any Suspicious Activity Reports (SAR's) on the money transactions Legisi had with ComTrust [....] Duncanson agreed to give up her broker's license for seven years starting 01/09 because of her involvement with Legisi and Lido Consulting." (p. 7/¶ 7).

> "According to [NFA staff], Duncanson had a personal and business account. Duncanson would introduce a buyer and would wire money to through (sic) Comtrust, to the DFCC [....] Large portions of money then left and entered into a Wyndham account owned by William Cordo, and checks would be issued out ..." (p. 8/¶2)

> "[NFA Staff] told us that Cordo is a well-known scammer who has been charged in the past for money laundering." (p. 8/¶4).

Mr. McKnight asserts that information he contributed to the government, or its appointed agents, arising from his proffer interviews and/or depositions assisted the government in its subsequent or ongoing investigations of one or more of these various individuals.

Mr. McKnight further asserts that, had counsel thoroughly investigated the correlation between Mr. McKnight's informational assistance and the corresponding results in government actions, counsel would have been able to provide the Court with a substantive argument for a downward variance.

In light of such a developed argument, Mr. McKnight avers, the Court would have been persuaded to adopt a sentencing variance below his original Guidelines range.

Defense counsel has a responsibility to thoroughly investigate all aspects of his client's case, especially as it relates to potential mitigating circumstances at sentencing following a negotiated guilty plea.[9]

The record indicates that counsel did investigate case law concerning both the departure and variance questions related to substantial assistance. First, there is counsel's memorandum filed in support of postponing Mr. McKnight's sentencing hearing. (DE 13). That brief was propagated by an order of the Court requesting both parties to explore the Court's authority to resentence Mr. McKnight should sentencing take place as scheduled and he then continue his cooperation by being deposed while in prison. Counsel's analysis was accurate in so far as it defined the Court's authority given that scenario.

But there was scant mention of any consideration for substantial assistance by Mr. McKnight, except as it related to the issue of restitution. (DE 13; p. 4/¶4). The government's

---

[9]It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty. ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). The commentary accompanying the Standards explains that defense counsel "has a substantial and important role to perform in raising mitigating factors." *Id.,* at 4-55.

Sentencing Memorandum virtually ignores Mr. McKnight's five plus years of assistance in the case.( DE 10).

Second, we have counsel's Sentencing Memorandum. In it, counsel affirmatively agrees with the government. "Although McKnight has not provided substantial assistance toward the prosecution of others that would warrant a motion by the government for a departure pursuant to 18 USC 3553 (e) and USSG 5K1.1, he has provided substantial assistance in another context and manner. (DE 11; p. 6/¶ 1). Counsel goes on to ask the Court to consider, instead, Mr. McKnight's help in locating and recovering assets to offset victim losses. (DE 11; p. 7/¶5).

At first blush, the Court might deduce that counsel had investigated all possibilities of Mr. McKnight's contribution toward the government's investigation of others. Why else would counsel have made such an emphatic statement? But, as the Court now sees documentary evidence available to counsel at the time, there is evidence that Mr. McKnight did provide more than the government suggested. Mr. McKnight asserts that counsel simply didn't do his job in researching these available documents and follow up to connect the dots for the Court on his client's behalf.

Lastly, we have counsel's arguments at sentencing. Again, counsel echoes the government's position: "I'm not suggesting that there is any substantial assistance toward the prosecution of others for a 5K1.1 departure or a 3553 departure that's clearly not the case, but we are arguing that he did substantially assist all parties toward trying to make whole as best as possible these people who invested money with him." (Sent. Transc.; p. 15-16).

Case law regarding IAC claims is clear on second guess strategic choices made by counsel. But, that is not the situation here. This is not a case of either/or. Mr. McKnight does not challenge counsel's decision to argue for the Court to consider his sizeable contribution in the

28

recovery of money for victims. Instead, Mr. McKnight challenges counsel's failure to provide the sentencing Court valuable mitigating evidence that he did more — much more — than the government acknowledged.

In fact, the government's position was that Mr. McKnight did nothing, zero, in assisting it toward the investigation or prosecution of another. (DE 24; p. 21/n. 2-11). Counsel's response was not to simply acquiesce in silence, but to instead affirmatively agree. And, as Mr. McKnight has asserted, did so without a minimal effort to investigate. This is not to suggest that counsel should have argued for the government to file a 5K1.1 motion. Case law is clear that such an action is at the discretion of the government and is virtually unchallengeable, unless, of course, the government had previously promised to do so. But, because counsel failed to negotiate such a promise, Mr. McKnight has no legitimate claim as such.

Instead, Mr. McKnight's claim is grounded in counsel's failure to investigate and bring to the Court's attention the assistance he provided the government in the investigation and prosecution of others as it relates to a sentencing variance. See *U.S. v. Blue*, 557 f.3d 682 (6th Cir. 2009).

Counsel's passing reference (DE 11; p. 7/n. ¶4) to the Sixth Circuit's decision in *Blue* is instructive, for more than the obvious reason. After a preliminary review of pertinent facts in the *Blue* case, the court's opinion begins with a note that "regrettably, the parties did not undertake in their briefs," a review of the sentence's reasonableness under a deferential abuse-of-discretion standard. *Blue*, 557 f.3d at 684. This standard was applicable only as a result of *Booker*. Until that time, the Guidelines were mandatory, leaving the sentencing court with no discretion unless specifically prescribed by the Guidelines. *Id* at 685. This included §5K1.1 considerations, which require a motion from the government. *Booker* environment, "the

29

government's failure to file a Section 5K1.1 departure does not necessarily preclude a sentencing court from taking into account substantial assistance in light of the Section 3553(a) factors." *Id* at 686.

In concluding the Blue decision, the court stated that "even absent a Section 5K1.1 motion, the court might have considered Blue's allegedly substantial assistance in the context of the Section 3553(a) factors." Id. The appellate court acknowledged that counsel "made at least some effort" to present such an argument" but because the defendant did not raise a claim that the sentence was procedurally unreasonable, the claim was forfeit. *Id.*

Mr. McKnight's counsel accurately drew this Court's attention to the holding in *Blue,* but failed to understand the larger lesson which led to that holding. That is, defense counsel's failings.

Here, as in *Blue,* counsel "made at least some effort" to argue for a reasonable sentence based upon the defendant's assistance. But the extent of that effort in Mr. McKnight's case amounted to little more than a recitation of counsel's billable hours. (Sent. Transc.; p. 16/n. 6-10).

Counsel did not offer the Court a single shred of evidence as to the substance of Mr. McKnight's assistance as it related to anything other than loss recovery. In short, counsel never provided the Court a concrete reason to consider a variance or a low end of the Guidelines range sentence, based on his assistance in the investigation of others.

Mr. McKnight believes that his assistance to the government was substantial, not only for the contributions to recovering assets for victims, but for the help he provided the government in both criminal and civil investigations. Mr. McKnight notes that such assistance does not require his testimony at the trial of another. See U.S.S.G. §5K1.1 cmt (recognizing that "a broad spectrum of conduct" can make assistance substantial).

Mr. McKnight also asserts that assistance provided to the government in civil investigations, as by the SEC, is as valuable as a criminal prosecution or conviction. If Mr. McKnight's assistance contributed to the recovery of assets for victims in other cases of fraud or even to the shuttering of a questionable investment scheme before financial losses could mount, these details would be welcome consideration by the sentencing Court.

Instead, the court acknowledged Mr. McKnight's cooperative assistance "to the receiver," but then noted that though it "may well diminish to some extent the extent of the losses, but there doesn't seem to be any reasonable likelihood that all the victims will be made whole or anywhere near whole no matter how successful the collection efforts are likely to be." (Sent. Transc.; p.27/n. 17-22).

Mr. McKnight believes his assistance rose to a level associated with the granting of a downward variance. He asserts that counsel failed to investigate the available evidence to present to the Court in support of that goal, despite repeated requests by Mr. McKnight to do so.

As an indigent, *pro se* litigant, Mr. McKnight does not have the resources to marshal an effective investigation to provide the Court with detailed evidence of the type he alleges. Indeed without contradictory evidence in the record, the rules governing §2255 claims require the Court to accept these assertions as true.

The only evidence to the contrary is a declaration by counsel in Mr. McKnight's Sentencing Memorandum which infers counsel's objective knowledge on the subject, an inference that is directly refuted by Mr. McKnight's declaration submitted with this Memorandum of Law. All references by the government that are found in the record are specific to the government's position that Mr. McKnight's assistance did not rise to a level that the government believed deserving of a §5K1.1 motion (i.e., a departure).

Mr. McKnight avers that an evidentiary hearing with appointed counsel to assist in the objective investigation of this issue is warranted.

**Claim 1.5**

*Defense counsel has a duty to investigate and pursue mitigating circumstances that have significant implications at sentencing, especially when his client pleads guilty based on counsel's advice. Counsel also has a responsibility to ensure Guidelines applications follow established prescriptions to maximize his client's benefit. Here, counsel failed to develop available arguments as to the calculation of loss that likely would have resulted in a lower sentence.*

[C]ourts have held that "the interpretation of loss under §2B1.1 of the Guidelines is a question of law." (quoting *U.S. v. Hintzman,* 937 f.2d 1196, (7th Cir. 1991). For sentencing purposes "the district court is to determine the amount of loss [under U.S.S.G. §2B1.1(b)(1)] by a preponderance of the evidence.

*U.S. v. McCarty,* 628 f.3d 284, 290 (6th Cir. 2010) (quoting *U.S. v. Triana,* 468 f.3d 308, 321 (6th Cir. 2006) In calculating the loss, the district court need only make a reasonable estimate." *McCarty,* 628 f.3d at 290.

Section §2B1.1 of the Sentencing Guidelines requires a sentencing court to increase a defendant's offense level based on the amount of monetary loss attributable to his crimes. Loss is calculated as "the greater of actual loss or intended loss." U.S.S.G. §2B1.1 cmt. n. 3 (A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense." *Id.* Courts may use the defendant's gain as the measure of loss only if there is an actual or intended loss that cannot be determined. *Id.,* cmt. n. 3 (B). Courts have consistently

32

preferred not to substitute the defendant's gain because it ordinarily underestimates the loss. *Triana,* 468 f.3d at 323.

In Triana, oft quoted for the proposition that district courts need only make a reasonable estimate of loss the court's analysis concerning loss centered on §2B1.1. This Guidelines section deals, in pertinent part, with determining loss in fraud cases as it relates to calculating the defendant's sentencing range; that is, what enhancement level — if any — to add to the defendant's base offense level.

The *Triana* court explored the definitions of intended and actual loss, thoroughly reviewing calculations for both as a means of determining which was greater — as the Guidelines clearly call for — in order to determine the appropriate enhancement assignment.

But, in Mr. McKnight's case, the Court made no such effort. The record shows that every single reference to loss, save one, was done so generally. [10]Not once is there an attempt made by the Court or the government, or by counsel for the defense, to define the basis for the loss calculation as it relates to the Guidelines prescription for a determination of the greater amount of loss between actual and intended.

Importantly, the Court was presented with a harmonious presentation between counsel and the government leading up to the sentencing hearing. There were no conflicts between the two sides. They painted a unified picture for the Court, lacking in any semblance of an adversarial contest. The Court had no reason to question the "loss" amount initially presented, or — for that matter — any other potential issue that would normally emerge between the parties in a criminal proceeding.

---

[10]The only loss identified in the record with a basis of origin is $3.6 million attributed to investments. (DE 7, p.4¶ 1/).

In part, this was because Mr. McKnight had signed a plea agreement 18 months before sentencing that included a Factual Basis stipulating to an undefined "loss" of between $20 million and $50 million. (DE 7; p4¶ 3) Mr. McKnight's signature was based exclusively on the advice of counsel

Counsel presented Mr. McKnight with the plea agreement moments before he was to appear in Court. (Exhibit 1; p.5/n. 21). In and of itself, this is nothing out of the ordinary. It is a common thread pulled on by desperate defendants in collateral appeals every day. Nonetheless, it is a fact in Mr. McKnight's case. Why the government waited nearly four years to present a new change contemporaneously with the plea proposal and give the defendant less than 48 hours to consider is not known. Why counsel, who had the plea proposal for more than 24 hours, failed to review the proposal until moments before his appearance is equally unknown.

What is known, now, is that Mr. McKnight challenged the plea in its entirety, but was misadvised by counsel as to at least one of the elements (Claim 1.2). At the same time, Mr. McKnight challenged the ambiguous loss amount of $20 million to $50 million, only to be told by counsel that there was no time to dispute the matter; he either signed the agreement or went to trial and took his chances in an all or nothing gamble. (Exhibit 1; p.5/n. 23).

Counsel then explained that the loss amount was a moving target, yet to be solidified by the receiver appointed by the court in his civil proceeding. (Exhibit 1; p.5/n. 22). Mr. McKnight took this to mean that there would be a rigorous accounting of the loss amount prior to sentencing. (Exhibit 1; p.5/n. 22). Mr. McKnight also understood the wide ranging estimate was only linked to the restitution amount of $48 million plus. (Exhibit 1; p.5/n. 22).

34

Prior to the issuance of the PSR:

Counsel never explained that the ambiguous loss estimate of $20 million to $50 million was to be used to enhance his sentencing range; that it would result in an increase of 22 basis points. (Exhibit 1; p.5/n. 21).

Counsel never explained the Guidelines range of loss estimates and that a lower loss estimate would result in a lesser enhancement, and a lower sentencing range. (Exhibit 1; p.5/n. 21).

Counsel never explained the Guidelines prescription for distinguishing between actual loss and intended loss, or what these terms meant. (Exhibit 1; p.5/n. 21).

Counsel never explained or described for Mr. McKnight any of the enhancements, including loss that the government had projected in arriving at the sentencing range. Counsel never told Mr. McKnight that he could go to trial and plead guilty to the charge (based on counsel's erroneous advice as to the intent element), but then challenge the amount of loss. (Exhibit 1; p.5/n. 21).

Counsel never told Mr. McKnight that he could plead not guilty and explain to the Court the government's (apparent) insistence on the loss estimate was the only thing preventing a plea agreement. Or that such a strategy could put pressure on the government to revise the plea proposal to allow the U.S. Probation Office to determine the loss amount on its own and let the two sides present any opposing objections and arguments in a true adversarial setting. (Exhibit 1; p.5/n. 21).

Mr. McKnight was led by counsel to believe he had only two options, only two available strategies: accept the plea agreement as is, or go to trial and take his chances on an even greater sentence. (Exhibit 1; p.5/n. 23). Because counsel had convinced him that he was guilty of all

35

elements of the crime (claim 1.2), Mr. McKnight did the only thing he felt he could do and signed the agreement. (Exhibit 1; p.5/n. 23).

Mr. McKnight now believes that had counsel timely reviewed the plea proposal, there would have been an opportunity for limited negotiations with the government on the proposal.

Mr. McKnight further avers that it is more likely than not that the government would have, at the very least, allowed for a narrow exception to the appeal waiver on the exclusive issue of loss.

But, what of the Rule 11 hearing following Mr. McKnight's acquiescence to the plea proposal? First, the Court asked if Mr. McKnight had "full opportunity' to discuss the charge and whether they had explored all his options, including whether or not to plead guilty. Mr. McKnight answered in the affirmative. (Plea Transc.; p. 8/n. 2-7.)

At the time, Mr. McKnight had no reason to believe counsel had misadvised him. He had no idea that he had any other options other than the two counsel gave him. He even followed up with the uneducated, generic question, "Isn't there anything else we can do?" Exhibit 1; p.5/n. 23.

While Mr. McKnight wasn't happy with counsel's negative answer, he was satisfied that counsel was knowledgeable of the law and would have told him if there were other legal options or strategies. At the time, he had no reason to be dissatisfied with counsel's performance.

The Court offered to give Mr. McKnight additional time to talk about the agreement if he felt he needed to. Again, Mr. McKnight had no reason to question the counsel he had received. (Plea Transc.; p. 8/n. 8-10 and p. 9/n. 9-11.)

36

As the Court began reviewing the factual Basis from the plea agreement, Mr. McKnight was asked if it was true that Legisi had raised $72 million from over 3,000 members of the public.

This was a question he himself had asked counsel when he first read the document moments before the hearing. Counsel assured him the numbers were accurate and that they came from the receiver. When Mr. McKnight asked for an opportunity to see the numbers, counsel indicated, that a full accounting would be done before sentencing. (Exhibit 1; p.5/n. 22). The same is true of every other query the Court made regarding company finances, including all losses, expenses and the calculated (but yet to be analyzed) restitution amount.

Mr. McKnight's assertions on these issues do not appear in a vacuum. Mr. McKnight challenged the numbers openly at sentencing 18 months later. (Sent. Transc.; p.5/n. 14 &15). Mr. McKnight had become disillusioned with Counsel's performance since the plea hearing particularly because of counsel's failure to test the government's, and the receiver's, numbers and accounting methods.

Mr. McKnight's assertions as to counsel's proclivity to "kick the [loss] can down the road" is supported by the record as well. During a discussion between the parties at sentencing regarding restitution, counsel acknowledged Mr. McKnight's dissatisfaction with the lack of open analysis and testing of any loss amount. (Sent. Transc. p. 5/n. 8-12). Counsel also acknowledged that the "finances in this case are very complex and involving many securities and many assets." (Sent. Transc.; p. 5/n. 23-24). Counsel specifically asked the Court if the accuracy of the government's figures could be "worked out at a later time." (Sent. Transc.; p. 5/n. 22).

To be sure, the issue counsel was referring to was the result of the receiver's presentation to both parties of revised numbers in calculating loss. The government presented the revision as a

37

matter exclusively dealing with the restitution calculation. But, Mr. McKnight's challenge in the courtroom was in the broader context of loss in general.(Exhibit 1; p.5/n. 22).

While the receiver's revision was well within the loss range stipulated in the Factual Basis, Mr. McKnight had repeatedly asked counsel to obtain discovery from the government, including the receiver's files, so that they could review and analyze them. Mr. McKnight also proposed that counsel hire a forensic accountant to do a rigorous accounting of the loss issue. (Exhibit 1; p.5/n. 22).

Mr. McKnight avers that the loss estimate, be it actual loss or intended loss, is far below the $20 million counsel convinced him to stipulate to. Mr. McKnight suggests that the $3.6 million number, the only number specifically defined by the government, is closer to the "actual loss" amount in this case.

As for intended loss, Mr. McKnight argues that this number is much more difficult to calculate, or even estimate. Intent is a question discussed at length in one of Mr. McKnight's earlier claims (Claim 1.2) and has application here.

Mr. McKnight believed that the temporal parameters of the Factual Basis counsel advised him to sign was nothing more than an acknowledgement of the dates his Legisi website was available to the public. (Exhibit 1 p. 1/n.4). Mr. McKnight argues that the calculation of intended loss is similar to the argument involving intent in general; that is, when did Mr. McKnight's admittedly legitimate enterprise turn into a scheme to defraud.

As previously stated in Claim 1.2, counsel, the government, and the Court all acknowledged at sentencing that Mr. McKnight's business began as a legal enterprise with Mr. McKnight's best intent. When that intent changed and became criminal in nature has never been clearly

established. The closest thing to an explicit proposal is the government's unsubstantiated claim at sentencing that it was within the first month or so.

Counsel's failure to object to the government's assertion as to when Mr. McKnight's conduct turned from legitimate intent to illegal intent is an example of IAC. While the Guidelines provide, according to Sixth Circuit precedent, for a court to establish a "reasonable" estimate, there is no such provision from estimating when a legal enterprise becomes an illegal enterprise for the purpose of attempting to calculate loss. Because counsel never challenged this temporal issue, the undefined loss estimate found by the Court is not reasonable.

Mr. McKnight argues that the objective "actual loss" and "intended loss" is significantly less than the low end of the estimate ($20 million) and supports a much lower sentence based on a smaller enhancement. Furthermore, Mr. McKnight argues that his agreement to all related issues in his Factual Basis was the result of counsel's failure to explain that any of these issues had a direct, or even indirect, correlation to his sentencing range. Had he known that the loss estimate he was acquiescing to would not be rigorously challenged before sentencing, had he known that the loss estimate added years to his sentencing range, he never would have signed the agreement.

Accordingly, Mr. McKnight's plea agreement was not knowing or voluntary and he asks the Court to invalidate it and vacate his conviction. In the alternative, Mr. McKnight requests that this Court hold an evidentiary hearing to resolve this matter through empirical analysis. Mr. McKnight asks that the Court appoint counsel for this hearing and approve the expenditure of a forensic accountant to thoroughly and rigorously challenge the government's numbers as is his right to do.

39

**Claim 1.6**

*To provide effective assistance, counsel must be aware of controlling law and its application to the case at bar. Here, counsel failed to object when the Court delegated its authority to determine a restitution payment schedule to the Federal Bureau of Prisons ("BOP"). The resulting penalties assessed by the BOP against Mr. McKnight for failure to meet its schedule is a consequence of ineffective assistance of counsel.*

For any offense committed by fraud, the court must order the defendant to make restitution to the victims of the offense. As part of the restitution judgment, "the court shall [ … ] specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, "and in so doing shall consider the factors outlined by statute. 18 U.S.C. §3664(f)(2).

The plain language of the statute was the impetus of a 1999 opinion by the Third Circuit, which was later adopted by the Sixth Circuit.

> "[T]he Third Circuit based its decision to remand to the district court the restitution order in [Coates] not only because of an improper delegation of the district court's duties to the probation office, but also because the district court failed to satisfy the MVRA's mandatory requirements under §3664 that the district court alone 'shall' set payment schedules [ … ] We find the analysis in Coates persuasive, and believe that the district court in the instant case erred in failing to set Defendant's restitution payment schedule." *U.S. v. Davis*, 306 F.3d 398, 426 (6th Cir. 2002) (citing *U.S. v. Coates*, 178 F.3d 681, 685 (3d Cir. 1999).

In *Coates*, the district court entrusted this responsibility to the probation office. However, in *Davis* — as here — the sentencing court delegated responsibility for determining the payment schedule to the BOP. With *Davis*, in pertinent part, the Sixth Circuit remanded back to the district court so that court could set a payment schedule per the law.

40

To be clear, the Davis court made a distinction that its opinion "does not preclude the district court from eliciting the assistance of others in setting such a schedule. "*Id.*, at 685 (citing *U.S. v. Ayantayo*, 20 Fed. Appx. 486 (6th Cir. 2006) (unpublished)).

But, in Mr. McKnight's case, the Court did not simply ask the BOP for its advice or recommendation. The Court's words are unequivocal.

> "Defendant shall participate in the [BOP's] inmate financial responsibility program. The Court's aware of the requirements of the program and approves payment schedules of the program and orders defendant's compliance." (Sent. Transc.; p. 28/n.21-24).

The Court's general awareness of the BOP's requirements and payment schedules for its system-wide, generic program formula is not sufficiently specific to Mr. McKnight's case for purposes of §3664 (F)(2). By giving the BOP responsibility for specifying both "the manner in which" and "the schedule according to which" restitution payments should be paid, without further review of the Court, it abdicated its authority in contradiction of the law and failed to satisfy its statutory mandate.

Mr. McKnight asserts the principles declared in Davis and entrenched in 18 U.S.C. §3664 (F)(2) were well settled Sixth Circuit law he was sentenced in 2013, more than a decade after *Davis* was published. Even a cursory review of Sixth Circuit opinions on the subject leading up to Mr. McKnight's sentencing would show that Davis was still good law. See, e.g., *U.S. v. Geedi*, 490 Fed. Appx. 755, 760 (6th Cir. 2012)[11] (unpublished).

Counsel should have been aware of existing authority at the time. Accordingly, it was not reasonable for counsel to ignore the Court's obvious error in light of controlling statutory and

[11]("Because the district court determined the amount of restitution owed, but has not specified the manner or schedule of payment, we will remand to the district court with instructions to issue a schedule of payments.") (citing the *Davis* decision and the "mandatory requirements under §3664 to set a specific payment schedule) (limited remand).

41

case law on this issue. Had counsel timely objected and rehearsed the law with the Court, perhaps including a proposed payment schedule covering his incarceration period, Mr. McKnight avers that the outcome would have been different.

As it stands, Mr. McKnight has suffered when he first began serving his time at FCI Milan (Michigan), BOP staff put him under a minimum payment schedule from its Financial Responsibility Program ("FRP"), $75 per quarter. Several months later, after observing Mr. McKnight's spending habits at the prison commissary for his first six months, determined that his payment terms should increase exponentially to $140 per month.

Mr. McKnight tried to explain that his monthly income from his job as a prison electrician came to only $18 per month. But BOP staff pointed to his spending history. Mr. McKnight tried to explain that the monies he had received were limited gifts from family, enabling him to buy many of the initial purchase items associated with inaugurating prison life (e.g., winter clothing; tennis shoes for exercise; OTC medications). But, Mr. McKnight was told that such considerations did not matter, that policy was policy. The best he could hope for was a subsequent review six months later.

The consequences of the BOP's decisions regarding Mr. McKnight's FRP payments are a direct result of counsel's ineffective assistance. [12]Counsel's negligence cannot reasonably be attributed to mere tactic or strategy.

Mr. McKnight suggests a monthly payment schedule of $18 per month, the full value of his monthly income from his prison job — so long as he is employed.

---

[12]Because Mr. McKnight was unable to meet the BOP's payment schedule (as a result of the absence of financial gifts from family received during his first several months of incarceration), BOP staff put him on FRP Payment Refusal status. As a consequence: (A) His monthly pay was lowered to $5.25; (B) His monthly commissary limit dropped from $360 to $25; (C) He was not allowed to work in Unicor or the Commissary; (D) His program participation points were eliminated; and (E). His custody points were raised.

**Claim 1.7**

*Unlike loss calculations dictated by the Guidelines Manual for purposes of establishing a sentencing range, restitution calculations are dictated by Congressional Statute. The former allows for reasonable estimates, the latter does not. Counsel failed to affirmatively pursue a rigorous accounting of the loss amount as it is related to restitution. As a result, the Court determined a restitution amount that was millions of dollars greater than it should have been.*

The Sixth Circuit has explicitly recognized that "restitution is a part of one's sentence." *U.S. v. Curry*, 547 Fed. Appx. 768, 771 (6th Cir. 2013) (unpublished) (citing *U.S. v. Gibney*, 519 f.3d 301, 306 (6th Cir. 2008)). As such, the calculation of restitution qualifies as a critical stage of the criminal process, thus requiring constitutionally effective assistance of counsel.

Restitution amounts are controlled by statute, not by the Guidelines manual. For any offense committed by fraud, the court must order the defendant to make restitution to the victim of the offense in the full amount of the victim's loss. 18 U.S.C. §§3663A (a)(1), (C) and 3664 (f)(1)(A). Accordingly, restitution is to be calculated as the greater of the value of the property on the date of the "damage, loss, or destruction" or the value of the property on the date of sentencing, based on the value of any part of that returned property as of the date it was returned. §3663A (b)(1)(B).

Importantly, "[u]nlike the loss calculation under U.S.S.G. §2B1.1, which can be based on intended loss, the restitution calculation can only be based on actual loss." *U.S. v. Healey*, 553 Fed. Appx. 560, 567 (6th Cir. 2014) (unpublished) (citing *U.S. v. Simpson*, 538 f.3d 459, 465-66 (6th Cir. 2008)). The district court determines the amount of restitution by a preponderance of the evidence, and the government has the burden of establishing the amount of the loss. *Healey*, 553 Fed. Appx. at 567; 18 U.S.C. §3664(e). However, no allowance is made for

43

reasonable estimates in calculating restitution as has been interpreted for calculations of loss for purposes of Guidelines enhancements.

In this case, it was defense counsel who did the heavy lifting to ease the government's burden. Counsel advised Mr. McKnight to sign the plea agreement, which included a Factual Basis that became the cornerstone of the government's position at sentencing. The Factual Basis included three specific references to loss as a result of Mr. McKnight's conduct. None of the references offer any attribution as to the source or manner of calculation.

First is that Mr. McKnight's legitimate investments "generated significant loss" and then specified this adjective by claiming that total losses came to $3.6 million. (DE 7; p. 4¶ 1). Second was a generic ascription of "losses of $20 million" over the course of the alleged scheme. (DE 7; p. 4¶ 3) The third, and last, specifically addressed the present issue, telling the Court that the parties "have agreed that the full amount of restitution in this case is $48,969,560." (DE 7; p. 8¶ 3). It is worth noting that this restitution amount falls within the boundaries of the previously ascribed generic loss amount. It is equally noteworthy that this amount is dramatically greater than the more narrowly defined $3.6 million referenced earlier.

Mr. McKnight asserts that he challenged each of these numbers when counsel first reviewed them with him moments before his signature was required. (Exhibit1; p. 5/n. 22). While Mr. McKnight observed that the $3.6 million number appeared reasonable in comparison to the other numbers, he was concerned that none of the numbers provided any basis as to how they were arrived at. (Exhibit 1; p. 5/n. 22) Counsel told Mr. McKnight that the numbers were developed by the court appointed receiver from his civil suit. (Exhibit 1; p. 5/n. 22) Mr. McKnight said he understood that, but wanted to see the analysis so he could review the methodology used in the calculations; he wanted specificity. (Exhibit 1; p. 5/n. 22).

44

Counsel led Mr. McKnight to believe that he needed to sign the agreement or go to trial. (Exhibit 1; p. 5/n. 23). However, counsel never advised Mr. McKnight that he could in fact go to trial and plead guilty to the charge, but contest the loss amount. (Exhibit 1; p. 5/n. 21). Instead, counsel assured Mr. McKnight that these numbers simply represented a starting point and that the dollar figures were a "moving target" that would eventually be resolved. Mr. McKnight took this to mean that the numbers represented a legal technicality that would be concluded before sentencing. (Exhibit 1; p. 5 /n. 22).

Counsel's language in this exchange was mirrored at sentencing. At the beginning of the hearing, the Court asked if there were any corrections or additions to the PSR. (Sent. Transc.; p.4/n. 22-23.) The government informed the Court that it had an "updated restitution figure" based on information from the receiver in the civil case. (Sent. Transc.; p. 4-5). That number was roughly $6.5 million less than the original number.

The Court asked if the defense agreed with this new number. Defense counsel, attributing the reduction exclusively to recoveries by the receiver, said "that's a figure that I think will be continuously changing." (Sent. Transc.; p. 5/n. 8-12). The Court persisted: "Well, is it accurate as of this date?: (Sent. Transc.; p. 5/n. 13).

In response, Mr. McKnight addressed the Court directly in what was to be one of only two such exchanges at the hearing.[13] "I don't believe so, I don't know how he came up with the figures. (Sent Transc.; p. 5/n. 14-15). This answer simply reflected his desire to have a rigorous

---

[13]The only other time Mr. McKnight directly addressed the Court was much later in regard to his decision not to speak. (Sent. Transc.; p. 19/n. 6). Mr. McKnight avers that both exchanges were prompted by what he considered the Court's direct inquiry; that is, every other question was posed to counsel and not to him. (Exhibit 1; p. 4/n. 22). He felt any other input would be unwelcome and rejected, hence, to his detriment. (Exhibit 1; p. 4/n. 22).

accounting of the numbers. It was consistent with his objection when counsel showed him the

figures nearly 18 months earlier, as well as multiple requests made of counsel during that

 18-month period. (Exhibit 1; p. 6/n. 22).

Again counsel interjected his interpretation of the government's attempt to amend the

restitution number, this time with slight clarification.

> "Well, the defendant isn't quite sure how they came up with that figure. New numbers were given to the prosecution and myself by Charles Murphy, an attorney with Clark Hill who's in court today based *I imagine in part on monies received by the receiver,* but the defendant, Mr. McKnight, believes that figure may not be totally accurate. Is that something maybe we could work out later, Judge, or, 'cause the finances in this case are very complex and involving many securities and many assets that had been collected that are in various stages of collection.'" (Sent. Transc.; p.5/n. 16-25). (emphasis added)

But the message was still the same. Counsel told the Court that he had reviewed the

numbers Mr. Murphy had given him that day and "imagined" that the corrections were

primarily attributed to recoveries. The Court then asked for the government's response.

> "First, Mr. McKnight agreed to a restitution figure in the Rule 11 agreement that's actually slightly higher than what the government's asking for now and that's basically the receiver actually had more accurate figures than the government did at the time and just so Mr. McKnight is aware of where the numbers come from, the receiver set up a claims process and identified approximately 1,800 victims or so and went through a lengthy process in identifying the amounts owed and the victims of the defendant's fraud and the total amount was a little over 44 million dollars. The number I gave the Court is less 1.5 million dollars that the receiver has distributed back to the victims since that, the claims procedure was instituted." (Sent. Transc.; p. 6/n. 2-14).

The government's description is clear. Only $1.5 million of the total adjustment it was

proposing to the Court came from what could possibly be termed "recoveries," Mr. McKnight

asserts that those monies were part of the liquid assets the government seized as part of the

SEC's civil action back in 2008. Mr. McKnight further asserts that at the time of sentencing, this

$1.5 million number was the only distribution of assets made by the receiver to victims.

The bottom line to the government's description of the change it was proposing is that roughly $5 million was a more accurate total restitution number; that is, a more accurate starting point from which recoveries could be deducted.

| Rule 11 Agreement | $ 48,969,560 |
| Asset Distribution | 1,500,000 |
| | 47,469,560 |
| "Proper Restitution Amount"[14] | 42,551,823.94 |
| Difference | 4,917,737.06 |

The difference of roughly $5 million is, accordingly, the actual change the receiver is proposing as a more accurate starting point for the purposes of restitution. Instead of asking the Court for a decision, the government suggested the Court could decide the issue after sentencing, as long as it was within 90 days. Then, inexplicably seemed to suggest the Court rule against the government's proposed amended figure and leave it as is since the defendant had already agreed to the higher amount. (Sent. Transc.; p. 6/n. 15-21).

After some clarification of the record, the Court reminds the government:

> "Well the Rule 11 also provides that the Court will determine who the victims are and the individual amounts of restitution that they are owed. It also goes on to say that the parties agree that the Court may in its discretion accept the determination of Robert Gordon, the receiver for the estates of Legisi Marketing, Inc., who had been appointed in the case of S.E.C. against McKnight. It goes on to say that the parties recognize the amount of restitution will change over time." (Sent. Transc.; p. 7/n. 7-15).

This recitation appeared to mirror counsel's earlier description to Mr. McKnight when he signed the plea agreement nearly 18 months earlier. (Exhibit 1; p. 5/n.22). Instead of ordering a review of the numbers then and there, The Court proposed what it seemed to think

---

[14]"Proper restitution amount" is the language used by the government in its proposal at the beginning of the hearing. (Sent. Transc.; p. 5/n. 1-2).

was a compromise; that is, to simply insert the phrase "less any recoveries" (from the $48 plus million).[15] (Sent. Transc.; p. 7/n. 16-22). But this proposed compromise ignored the fact that the government's (and receiver's) amended number affected the starting point, and that recoveries should necessarily be subtracted from that downwardly revised figure.

What was the government's response? Agreed. (Sent. Transc.; p. 7/n. 23).

And defense counsel? "We're in agreement with that, yes." (Sent. Transc.; p. 7/n. 25).

This abdication of the issue was not consistent with what the restitution statutes demand. Both the government and defense counsel allowed the Court's misapprehension of the issue to go unchecked. Defense counsel, in particular, ducked his duty to his client to advocate for a fair and thorough accounting of the restitution figure. Counsel had 18 months to demand such an accounting, but failed to do so despite repeated pleas from Mr. McKnight.

Mr. McKnight's acquiescence to the $48 million plus number when signing the plea agreement was predicated on counsel's description of the number as a legal technicality, a "moving target." Mr. McKnight's affirmation at the Rule 11 hearing was based on this understanding.[16]

Furthermore, case law clearly shows that restitution can only be based on actual loss. The $48 million plus number referenced in the Factual Basis, and repeated in the PSR, is never defined. Is this number "actual loss" or "intended loss?" The Court never inquired as to the

---

[15]Mr. McKnight is also concerned that the term "recoveries" has never been defined by the Court for purposes of reducing his restitution amount.

[16]The Court asked Mr. McKnight if he understood that the agreement read that both parties agreed to the $48 million plus number. His affirmation that he understood that fact was not an affirmation that he necessarily agreed to the number. This nuance should be viewed in the context of Mr. McKnight's understanding of the number as a legal technicality — a moving target — as described by counsel. This was Mr. McKnight's state of mind when he responded to the Court's Rule 11 query.

government's corresponding basis for the number, presumably because the number had been agreed upon by both parties prior to sentencing.

Again, that agreement was based on the misadvice of counsel. Counsel never bothered to inform Mr. McKnight that restitution must be based on actual loss. Likewise, counsel never explained to Mr. McKnight what the legal definition of "actual loss" was, despite Mr. McKnight's repeated requests for clarification of the issue generally. Keeping in mind that such a definition for purposes of restitution may be, and arguably is, different than the Guidelines definition for purposes of sentencing, Mr. McKnight asserts that the only number offered in the record that qualifies is the $3.6 million identified as losses from investments. But, as Mr. McKnight has repeatedly averred, even that number has never been vetted.

Accordingly, Mr. McKnight asserts that his agreement to the restitution amount stipulated in the Factual Basis of the plea agreement was based on the constitutionally ineffective advice of counsel. Mr. McKnight therefore asks the Court to grant an evidentiary hearing to review the matter in detail. Mr. McKnight additionally asks for court appointed counsel preferably counsel with experience in "complex" financial issues, to allow opportunity to do a rigorous analysis of the receiver's calculations prior to such a hearing.

In effect, Mr. McKnight asks the Court to grant his right to evaluate the government's numbers and prepare a comprehensive response in his defense, a right he was never previously afforded due to counsel's innumerable failures.[17]

---

[17]Among those failures is counsel's propensity to "kick the can down the road" on making any effort to bring resolution to the restitution calculation at any point prior to the 90-day window after sentencing.

## Conclusion

Counsel in a criminal case has an obligation not only to be familiar with the case, but also to explain to the defendant what the government must prove in order to secure a conviction; discuss the evidence; and explain available options and sentencing exposure. *Titlow v. Burt*, 680 F.3d 577, 587 (6th Cir. 2012), reversed on other grounds *Burt v. Titlow*, 187 LED2D 348 (2013); see also *Smith v. U.S.*, 348 F.3d 545, 553 (6th Cir. 2003).

Counsel was clearly familiar with Mr. McKnight's case, having been appointed by the Court four years before his guilty plea; more than five years prior to sentencing. Yet, counsel failed on multiple levels in various critical stages of the process to provide the reasonably effective assistance the Constitution requires.

Counsel never explained to Mr. McKnight the implications of his appeal waivers as they related to that Sixth Amendment guarantee.

Counsel misadvised Mr. McKnight as to a key element of the crime with which he was charged, miscomprehending the government's time sensitive evidence and controlling case law.

Counsel failed to discuss with Mr. McKnight reasonable, available legal strategies in his case, preferring instead to limit Mr. McKnight's options to a simplistic either/or formula.

Counsel misadvised Mr. McKnight as to his legal liabilities in an immunity agreement that provided Mr. McKnight with little-to-no substantial protections or benefits in exchange for nearly five years of continuous cooperation.

Counsel utterly failed to discuss the role of the Sentencing Guidelines and its phalanx of enhancement criteria with Mr. McKnight prior to the issuance of the PSR.

What's more, counsel inexplicably failed to investigate or even attempt to corroborate the government's loss calculations, despite having at least 18 months to do so.

50

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690." However:

> "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690-91.

It can never be reasonable judgment to forego any investigation of the alleged loss in a fraud case that is so utterly dependent on such calculations; particularly when the defendant proffers a guilty plea to a charge without indictment based on counsel's advice to do so.

Likewise, counsel's failure to insist that probation, the government and the Court distinguish between actual and intended loss, as the United States Sentencing Guidelines Manual requires, cannot be attributed to reasonably professional judgment.

Nor can it be considered reasonable for counsel to avoid even a minimal investigation of the government's successful use of information provided by his client in the investigation of others, when that same counsel directly participated in every proffer meeting and had access to the investigative agency's notes.

Mr. McKnight argues that counsel's failures in this case precisely represent the type of ineffective assistance envisioned in *Strickland* and deserve just recompense by vacating his conviction and allowing for a full and fair trial by a jury of his peers.

At a minimum, Mr. McKnight believes his arguments and supporting evidence are deserving of an evidentiary hearing. Even if the government attempts to persuade the Court otherwise, Mr. McKnight's presentation here at the very least, offers a series of factual disputes that require an evidentiary hearing in order to determine the truth of his claims. *Valentine v. U.S.,* 488 F.3d 325, 333 (6th Cir. 2007).

51

Respectfully submitted this _1st_ day of _September_, 2015.

Gregory N. McKnight
Reg. No. 46755-039
FCI Milan
P.O. Box 1000
Milan, MI 48160

## Certificate of Service

I, Greg McKnight certify that a true and correct copy of this Memorandum has been sent by

U.S. Postal Mail postage pre-paid, to the AUSA's office indicated below.


Gregory N. McKnight
Reg. No. 46755-039
FCI Milan
P.O. Box 1000
Milan, MI 48160




AUSA
A. Tare Wigod
600 Church St.
Flint, MI 48502

53

# EXHIBIT 1

## Declaration of Greg McKnight

1. My name is Gregory McKnight. I was born on February 20, 1960. I am a federal inmate (Reg No. 46755-039) currently housed at FCI Milan in Michigan.

2. I was sentenced to 188 months imprisonment by the U.S. District Court for the Eastern District of Michigan, Flint Division, on August 6, 2013. The sentencing followed a guilty plea to a single count of wire fraud, supported by an Information. 18 U.S.C. §1343.

3. The following narrative describes various events leading up to my sentencing hearing. I have divided this declaration into separate, numbered subheadings consistent with the Claims identified in my §2255 filing. See Ground One, claims 1.1 through 1.7.

4. In late December 2005, I began marketing my company "Legisi", on the Internet at Legisi.com as an opportunity for interested parties to earn a higher than average return by loaning capital to my company. These loan proceeds were subsequently invested in various instruments including, but not limited to, online high-yield investment programs (HYIPS); foreign exchange accounts; commodities trading accounts; private placement stock deals; bonds; commercial and residential real estate; gold and gold equivalents. I began investing the funds in late January 2006.

5. The bulk of the loaned funds were transferred from individuals' personal e-bullion or e-gold accounts to Legisi's e-bullion or e-gold accounts and from there wired to Legisi's bank account for use in purchasing investments or paying company expenses.

6. In or about September of 2007, I received visitors at my office. These two men said they were interested in joining Legisi, but had questions. I talked with them for several minutes and they left my office. They returned very shortly and I was served with

papers indicating I was now under investigation by the Securities and Exchange Commission (S.E.C.).

7. After they had served me with the paperwork, the two men wanted to continue our conversation. After answering several questions, I asked the man identified as a Secret Service Agent named Vargas what I should do at that point. He said to stop taking in money. Immediately after they left, I shut down the website and hired the Roth Law firm from New York City based on a recommendation from one of my brokers, Michael Lichtenstein, of Sierra Equity.

8. Mr. Roth represented me during my civil investigation and subsequent lawsuit by the S.E.C. One such meeting was a deposition with the S.E.C. where Mr. Roth instructed me to exert my 5th Amendment rights to all questions. Shortly after that meeting in Chicago, Mr. Roth suggested locating an attorney local to me to assist in the case. In late January or early February of 2008, I retained Mr. Allen Robb of the Spender and Robb Law Firm.

9. Over the next few weeks, I talked with Mr. Roth or Mr. Robb infrequently to get an idea what was going on and what would be happening. Mr. Robb suggested I "squirrel away" as much cash as I could so I would have money to live on in case of a seizure by the S.E.C. I removed several thousand dollars from my personal bank account.

10. Robert D. Gordon was appointed in the S.E.C. case as the Receiver of my estate. On May 5, 2008, a representative of the Clark-Hill Law Firm of Birmingham, Mich. presented herself at my office and, with the assistance of the Michigan State Police, seized all of its contents on behalf of Robert D. Gordon.

2

11. A few days after this incident, Mr. Robb contacted me indicating he had spoken with an AUSA and that if there was a need for my arrest, I would be notified when and where to turn myself in. In the meantime, I was to turn over my car and a cash box containing several thousand dollars to the Receiver

12. On May 19, 2008, the door to my home was nearly broken down by police officers. I was served with a warrant, my home was searched and I was arrested. I was first taken to the office of the Secret Service in Saginaw, Mich. where I was processed and then transported to the Federal Courthouse in Bay City, Mich. I had no idea what was taken in the search until later, but the Secret Service had missed the money that Mr. Robb suggested I "squirrel away." We used that money for living expenses.

13. I appeared before Magistrate Judge Charles Binder the very same day. AUSA Barbara Tanase appeared for the prosecution. I was arraigned on a single count of wire fraud. I was instructed that I would be appointed an attorney and I was released on bond. The case was dismissed without prejudice about 3 weeks later. Prior to the proceeding, I spoke with the AUSA Barbara Tanase and afterwards, she loaned me her phone to call my wife.

14. Shortly after my arraignment, I met with Mr. Edward Wishnow at his Birmingham, Mich. office. He explained that he was my appointed attorney and wanted to know if I planned to plead guilty. I explained that I wasn't sure I was guilty of fraud. He said that, because of misrepresentations on my websites, I was guilty of fraud.

15. Mr. Wishnow also told me that, if I decided to plead guilty, he would work to have me plead to an Information rather than involve the Grand Jury.

3

16. When I showed up to check in with pretrial services, I was informed that my case was dismissed. Mr. Wishnow somehow continued to represent me even after the case was dismissed. I asked him several times how he could remain my lawyer when I wasn't charged with anything. He'd always just say how complicated this case was and that the investigation continued.

17. Mr. Wishnow continually brought up that the government wanted more information from me. I told him I was more than willing to cooperate with them if I had some sort of immunity to protect me. I wanted to help recover assets, but I did not want my words twisted around and used to incriminate me. It was always my hope that my assistance would lead to complete dismissal.

18. What was continually referred to as a "Kastigar" letter was drafted. Mr. Wishnow explained that they (the government) agreed not to use anything I told them against me in their case in chief, if it came to that, as long as I was truthful. Based on his explanation and advice, I signed the letter on November 8, 2008.

19. Several proffered meetings took place over several months including a polygraph exam on September 2, 2010.

20. Several months went by with little to no activity on the case at least from my perspective. Wishnow contacted me in February of 2012 indicating that he'd received the Information. We met and discussed it. He said I would receive much more prison time if the Grand Jury were to indict me. Mr. Wishnow presented me with a 1 count Information for wire fraud on or about February 12, 2012. I again asserted that I never intended to defraud anyone. That I didn't think I was guilty of fraud. Again, Wishnow told me that I was guilty of fraud and that I would be fighting a much greater

4

(25 years to Life) sentence if I went to trial rather than accept the plea agreement that was forthcoming.

21. It was not until February 16, 2012 that I was allowed to briefly page through my plea agreement. Wishnow, my wife and I were meeting in the courthouse prior to my plea. Nothing was explained to me by Wishnow other than my not accepting the plea agreement would result in losing and being sentenced to much greater prison time if taken to trial. Had he explained the appeal waivers in detail, I would not have signed the agreement.

22. When I first read the Information, I realized that the transaction being used to charge me with wire fraud could only have come from a proffered meeting. I asked Wishnow how they could use it. He told me they probably would've discovered it anyway. I also told him I didn't agree with any of the "numbers!". That is, I was never shown anything that proved the losses that the prosecution was claiming. I assumed that the numbers would be changing and were not definite! Wishnow said they came from the Receiver and were accurate. I assumed a more exact accounting would take place but it never has. I could not understand how the loss could possible be so great when the value of the assets seized by the Receiver were in excess of $40 million dollars. Wishnow promised to look into it but still has not, even after several requests. I tried to voice my concerns in court during sentencing, but since the Judge still controlled 37 months of my life (the sentence range) I didn't feel like I should speak up over my attorney.

23. I again, told Wishnow that I didn't feel I was guilty of fraud. That I didn't feel right pleading guilt to something I didn't do. He said the prosecutor promised I'd be facing a 25-Life sentence if I went to trial and that would happen if I wasn't believable to the

Judge. I asked, "Isn't there anything else we can do? Wishnow replied, "No." I felt I had no other choice but to plead guilty to wire fraud.

24. On August 6, 2013, after several adjournments and an additional 18 months of my cooperation with the government, I was sentenced to 188 months in prison.

25. My appellate attorney, Mr. Lanker, later informed me that my so-called Kastigar letter was a simple limited immunity agreement.

Submitted this ⸺ day of ⸺ 2015.

Gregory N. McKnight

6

# EXHIBIT 2

## Affidavit of Linda McKnight

1. On February 16, 2012, my husband, Gregory (Greg) McKnight and I arrived at the Federal Building in downtown Flint, Mich. fairly early in the morning.

2. This was the day my husband, Greg, was scheduled to plead guilty to a charge of wire fraud.

3. When his appointed attorney, Mr. Edward Wishnow, finally arrived, he asked us to follow him to a nearby conference room where our meeting would be more private.

4. Leading up to this day, Greg and I had discussed his plea many times. He never felt that he was guilty of fraud, but felt forced to plead guilty by the circumstances.

5. In our meeting, Greg pointed out that he had not yet read the agreement. Mr. Wishnow said he had very little time to read and sign the agreement, only 15 minutes or so.

6. Greg told Mr. Wishnow that he wasn't comfortable pleading guilty to something he didn't feel he was guilty of. He asked if there was anything else that could be done.

7. Mr. Wishnow explained that unless he did plead guilty and make himself believable to the Judge then the charges would be increased against him and he would have to go to trial facing a sentence of 25 to life. This is why Greg felt forced.

8. No attempt was ever made by Mr. Wishnow to explain the waivers in the plea agreement. I never heard an explanation of what a 2255 was. I still don't know.

9. Greg also pointed out that, according to the plea agreement itself, it had expired the day before. Mr. Wishnow said, "It will be taken care of." And, so reluctantly, my husband signed the plea agreement based on Mr. Wishnow's recommendation and explanations.

Submitted this ___ day of ___, 2015.

_Linda S. McKnight_

Linda S. McKnight

# EXHIBIT 3

AO 91 (Rev. 5/85) Criminal Complaint

(9)

# United States District Court

| | | |
|---|---|---|
| **EASTERN** | **DISTRICT OF** | **MICHIGAN** |

UNITED STATES OF AMERICA

v.

GREGORY N. McKNIGHT

**CRIMINAL COMPLAINT**

CASE NUMBER: 08-MJ-30232

**FILED**

MAY 19 2008

U.S. DISTRICT COURT
BAY CITY, MICHIGAN

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about January 18, 2007, in Genesee County, in the Eastern District of Michigan defendant, having knowing and intentionally devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, by means of a wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice; to wit, on or about January 18, 2007, defendant caused an investor to transmit and received an e-currency transfer of funds, such transfer occurring through a computer server located outside the state of Michigan, in furtherance of the scheme to defraud, all in violation of Title 18 United States Code, Section(s) 1343.

I further state that I am a special agent of the United States Secret Service and that this complaint is based on the following facts:

(SEE ATTACHED AFFIDAVIT)

Continued on the attached sheet and made a part hereof:   ☐ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 19, 2008
Date

at Bay City, Michigan
City and State

CHARLES E. BINDER
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT

I, Special Agent Aaron Knudson, being duly sworn hereby dispose and say:

1. I am a Special Agent with the United States Secret Service assigned to the Saginaw Resident Office. I have been with the United States Secret Service since March 2007. Prior to my employment with the United States Secret Service, I worked as a police officer in Rockford, Illinois, for two years. During my employment with the United States Secret Service, I have received extensive training in general law enforcement and criminal investigations at the Federal Law Enforcement Training Center and at the United States Secret Service Rowley Training Center, including training in and investigating financial crimes.

2. The information contained in the Affidavit is based upon information provided to me by other law enforcement officers, information obtained through public court filings and other public records, and my own personal investigation.

3. Gregory McKnight created Legisi Holdings, LLC, ("Legisi") around December 2005 for the purpose of investing funds for profit. Legisi is a Nevis, West Indies, limited liability company with its principle place of business is in Swartz Creek, Michigan. Legisi was created to serve as the entity through which McKnight conducted the offering of the Legisi program to investors. Legisi "borrowed" money from private lenders and promised its lenders an unusually high interest rate on their return, that is, between 10% and 12.5% on a monthly basis, depending on the amount of money they "loaned" to Legisi. McKnight had an internet website on which he warned investors never to use the terms "investments", "tax", or "guarantee". McKnight and Legisi eschewed the term "investment" and would dismiss any lender from its program that attempted to characterize his/her financial stake in Legisi as an "investment."

4. In December 2005, McKnight and Legisi Holdings began offering and selling interests in a pooled investment programs, variously called Legisi.com or Legisi ("the Legisi program"). McKnight promoted the offering around the globe through an Internet website at 222.legisi.com ("the Legisi website"). From December 2005 through at least November 2007, McKnight raised approximately $72 million from 3,000 to 4,000 members of the public. The 3,000 to 4,000 investors in McKnight's scheme ("Legisi investors") reside in all 50 states and several foreign countries.

5. McKnight, on behalf of Legisi Holdings and himself, raised money based on promises that he would invest the offering proceeds and then pay the investors a return each month with monies funded with profits from Legisi's investments. McKnight represented on the Legisi website and in conversations with investors that Legisi's investing activities consistently generated monthly profits, ranging from 15 percent to 18 percent. From those purported profits, McKnight promised

to pay his investors returns of as much as 15 percent per month. McKnight also represented that he set aside 10 percent each month from all profits of Legisi investments to create a reserve fund for the benefit of the Legisi investors. McKnight claimed that he would put profits into the supposed reserve fund until it totaled 110% of the total investors' principal that Legisi received.

6.    McKnight asserted on the Legisi website that the Legisi program was merely a "loan program" through which investors would "loan" money to Legisi and, in return, Legisi would pay investors high rates of interest. McKnight offered several investment options on the Legisi website. One option was the "Tester Fund," in which an investor was promised .25% interest per day with a $20 minimum principal 30-day investment. Another option was the "V.I.P. Fund" in which an investor was promised 15% interest per month with a $5,000 minimum principal one-year investment. To invest, an investor had to join the Legisi program by completing a membership form on the Legisi website, choosing a Legisi investment option, and setting up an account with an electronic currency ("e-currency") provider.

7.    Between December 2005 and August 2007, McKnight posted multiple representations concerning the profitability of Legisi on the Legisi website:

a.    Between December 2005 and May 2006, the Legisi website stated the "profits from these investments...are used to enhance our program(s) and increase stability for the long term."

b.    In January 2007, McKnight wrote on the Legisi Forum that "Legisi Holdings is simply a company that currently wants to borrow your money and re-pay you with a handsome interest rate. Obviously, we make money from your money. That['s] why we're in business."

c.    In or about March 2007, McKnight told an investor in a telephone call that Legisi was successful in the foreign currency market. McKnight also told the investor that the profits generated from Legisi's foreign currency and other investments would pay the interest the investor was to receive.

2

d. In May 2007, he wrote on the Legisi website, "our members loan us funds, choose their repayment terms and enjoy the interest payments. The sole purpose of Legisi Holdings, LLC is to profit more than we pay out in interest. We have been extremely successful at that since December 28, 2005."

e. In June 2007, a posting on the Legisi website stated that "Legisi makes about 15% a month on the money between Forex, options, warrants, and stocks; sometimes more, sometimes less, but let's just say 15%."

f. Throughout 2006 and 2007, McKnight posted on the Legisi website each investor's "account history," which listed the amount of interest that the investor had purportedly earned each month and the total value of their investment. The posted amount of interest earned always equaled the amount that McKnight promised to pay pursuant to the terms of the investment the investors chose.

g. McKnight also represented on the Legisi website in May 2006 and June 2007 and in conversations that he was compensated from the difference between the profits earned from these investments and the interest he promised to pay investors each month. In at least May 2006, McKnight wrote, "We are obviously receiving a higher return on our invested funds. We repay our members and keep a small profit for ourselves. Everybody's happy."

h. McKnight also represented on the Legisi website that Legisi had a "Reserve Account" in which he would place 10% of his trading profits until the account's balance equaled 110% of the total investors' principal that Legisi received. McKnight represented that he set up this account to protect investors should Legisi's investments not generate sufficient profits in any given month.

i. In May 2007, on the Legisi Forum, on which Legisi investors posted information and asked questions about the Legisi program, McKnight stated that Legisi had more than enough in its reserves to completely cover the funds frozen in his E-gold accounts as a result of a court order in a separate government action.

8. McKnight made similar representations in personal conversations with potential investors. On May 17, 2007, an agent from the USSS and an investigator from the State of Michigan Securities Division posing as potential investors interviewed Gregory McKnight at his business. McKnight stated that "People loan money to it (Legisi), we pay people a nice rate of return for the use of their

3

money". McKnight went on to say that, "Um, Is there a risk? The risk is to me and my profits, because the money is loaned to my corporation, we're obligated to pay you back – at that rate of return for the use of your money." McKnight went on to say that he uses the monies to purchase foreign currency, commodities and private replacement stocks. McKnight claimed that he was making between 16% and 18% profit per month and that McKnight was taking between 2% and 3% for himself. McKnight said, "2-3 percent of 80 million dollars is a nice monthly income." At one point in the conversation, McKnight made it clear that the money given to his company was not an investment. McKnight indicated that, "This is a loan to my corporation." When asked to explain the difference between a loan and an investment, McKnight stated, "The difference is – if I am selling investments and I am not registered with the SEC, I am going to prison." McKnight added, "If I am an offshore corporation, borrowing money from thousands of people or whatever they may be, through the Internet, then I don't have to register with the SEC."

9.    McKnight's representations to investors and potential investors were false. Of the approximately $72 million that McKnight raised from Legisi investors, he invested, net of withdrawals, only about $33 million. Far from being the wild success that McKnight portrayed to the Legisi investors, his investments in fact generated significant losses. All together, McKnight has realized losses totaling approximately $3.6 million on the investments he made with the Legisi investors' money. To the extent that McKnight paid "profits" or repaid capital to Legisi investors, the funds came from subsequent investors. Given its structure and the manner in which "interest" payments were made to its customers, Legisi was clearly just a conduit for McKnight's Ponzi scheme.

10.   McKnight diverted $39 million of the remaining offering proceeds for his own benefit. In the manner of a classic Ponzi scheme, he used approximately $27.5 million of the offering proceeds to make payments of purported profits to Legisi investors. McKnight used another $2.2 million of the offering proceeds to pay personal expenses, including at least $281,919 on motor vehicles, at least $190,682 for home repairs and renovations, at least $108,311 for vacations and travel, at least $102,024 to pay credit card bills, and sent at least $144,000 in total to his daughter, Jennifer McKnight; his niece, Danielle Burton; and his sister, Theresa Burton. In recent weeks, McKnight's niece Danielle Burton has withdrawn approximately $75,000 from McKnight's business accounts. McKnight also transferred at least $525,000 to another company of his, Lindenwood. McKnight did not disclose these diversions of investor funds.

4

11. I have spoken to an investor, hereinafter "VICTIM 1," who was a victim of the fraudulent scheme perpetrated by McKnight. Based on the conversation (and documents) I have learned that in early January 2007, VICTIM 1 first heard about Legisi and the high rate of return on the money loaned to McKnight's company, Legisi LLC. VICTIM 1 read on the Legisi website that McKnight worked in Flint, Michigan, and lived in Swartz Creek, Michigan, a community near Flint, Michigan. VICTIM 1 spoke to McKnight on numerous occasions on the telephone while McKnight worked both at home and at his office in Flint, MI. VICTIM 1 also met with McKnight in person at the Flint, MI, office, to discuss his loan. McKnight told VICTIM 1 he used monies loaned to Legisi, to invest in foreign currency and other commodities, generating monthly profits ranging from 15%-18%. VICTIM 1 believed McKnight could be trusted with his money.

11. VICTIM 1 was instructed by McKnight and the Legisi website that he needed to establish an e-bullion account to transfer his loan to account number, B75831, which is in the name of Gregory McKnight. The e-bullion server is located in the state of California. On or about January 18, 2007, VICTIM 1 made his first investment loan of $1,500.00 to Legisi for 120 days. VICTIM 1 said this occurred by him logging into his Legisi account online, clicking on the "Deposit" button, specify from what account he was transferring money from, then clicking "Submit". VICTIM 1 stated he transferred the $1,500.00 from his e-bullion account, C83512, into McKnight's e-bullion account, B75831, and within minutes, received an email confirmation stating his account was activated and the funds had been transferred. VICTIM 1 also said transaction number A05880383-MTP appeared on the confirmation email. VICTIM 1 said during the initial 120 days, he would log onto his Legisi account to see how much money he was making. After the 120 days, he saw his loan of $1,500 had earned 10% increase each month, compounded. VICTIM 1 reinvested the entire $1,500 plus interest into his account. He also received an extra 5% for each of the two people he recruited into loaning money to McKnight and Legisi.

12. In late September 2007, VICTIM 1 met with McKnight at his office. McKnight told VICTIM 1 that members would not be receiving any money until late 2007 because he was waiting for the funds to mature before he distributed them among the Legisi members.

13. On or about February 11, 2008, VICTIM 1 and a group of other investors met with McKnight at his office. VICTIM 1 asked McKnight when they would be receiving some or any of their money. McKnight told them, "Let's get this straight, it's my money."

14. During the month of March, VICTIM 1 saw his e-bullion account became inactive. He called Legisi and spoke to Danielle Burton. Danielle Burton told VICTIM 1 that it would not be a problem that since he was local, he could be paid his money directly rather then transferring money back through e-bullion.

15. John Moore was an investor in Legisi, who was interviewed by the Securities and Exchange Commission (SEC) and provided a sworn declaration. Moore heard about Legisi through friends. He first went to legisi.com in February 2007. The website said it accepted loans and in return, Legisi would pay the lender a monthly interest rate. Moore read on the web page that McKnight was the president of the company, and saw that he provided his contact information including his telephone numbers. Moore also read that Legisi was not a scam. Through browsing the webpage, Moore believed Legisi was profitable.

16. Moore called McKnight in March 2007 to ask him questions. McKnight told Moore that he was successful and one of the best at making money in foreign currency markets. Moore was told by McKnight that his investment would be placed in foreign currency market and other investments, and that Moore would receive 12.5% interest each month for one year. Moore was told that the interest he would receive would be from profits in those markets.

17. On or about March 27, 2007, Moore invested $10,000 from his e-bullion account into the Legisi e-bullion account. The e-bullion's server is located in California. Moore transferred this money from his user computer located in California, to Legisi, and subsequently, to Legisi, located in Michigan. Moore was to receive 12.5 % monthly interest rate for one year, and chose to reinvest all of his interest, rather then receiving monthly interest withdraws.

18. In June 2007, Moore attempted to withdraw his money from his Legisi account, but was unable to do so. Moore had correspondence with Danielle (Burton) who worked at Legisi. She told him he was unable to withdraw his money because he reinvested 100% of his interest earnings. Moore lowered the compounding rate, but was still unable to withdraw the money. Between June and September 2007, Moore was unable to access his account because the Legisi website was frequently down. Danielle told him the website would be down until they received a new server they ordered from another country.

19. Moore had not received any of his money as of April 29, 2008, and the last time he was able to access the website was October 11, 2007.

20. LaSalle Bank Account ending in xxx4668 that belongs to Legisi Marketing LLC, shows a beginning balance for June 2007 as $551,415. During the month of June,

that account shows over $4,134,236 in withdraws, and over $5,565,833 in deposits, leaving a balance of over $1,990,188. During the month of July, a total of over $2,768,064 in withdraws, and over $1,116,886 in deposits, leaving a balance of over $335,752. During the month of August, a over $2,052,520 in withdraws, and over $1,268,643, leaving a balance of $668,754. In the month of September, over $947,850 in withdraws, and over $504,477 in deposits, leaving a balance of over $225,372. In the month of October, over $698,912 in withdraws, and over $593,813 in deposits, leaving a balance of over $120,262.

21. Based upon information obtained during this investigation, I have probable cause to believe that assets and evidence of the Ponzi scheme and evidence of violations of federal law, specifically Title 18, United States Code, Section 1343, will be located inside McKnight's residence located at 5360 Winshall Drive, Swartz Creek, Michigan:

a. On May 5, 2008, Attorney Bob Gordon with Clark Hill Attorneys at Law, Receiver of Legisi Marketing, took control of powers and duties of the business. Attorney Gordon was appointed as the receiver for Legisi by order of Judge Paul V. Gadola, United States District Judge for the Eastern District of Michigan, at the request of the Securities and Exchange Commission ("SEC"), in Case No. 08-CV-11887. On that day, I accompanied a representative of the receiver, Attorney Danon Goodrum, to the Legisi's business office. Based upon information provided to me by attorneys from the SEC and my own observations, I know that some of Legisi's known assets were not located in the office.

b. On May 8, 2008, United States Secret Service Agent Zloto, a representative of Bob Gordon, Attorney Danon Goodrum and I met with Ryan Burton at his residence. At Ryan's residence, Attorney Goodrum took custody of a laptop computer owned by Legisi, and a Chevy pickup truck owned by Legisi.

c. In a November 29, 2007, posting on the Legisi Community Forum, McKnight wrote, "I sometimes work out of my home," when responding to a question as to why he was not in the office.

d. On May 14, 2008, McKnight delivered to the Receiver his Mercedes Benz, which was purchased by Legisi Marketing. McKnight also delivered

$37,500 in cash to the receiver. According to the receiver, the $37,500 cash were the remainder of funds from the $75,000 withdrawn from Legisi's business accounts by Danielle Burton as described in Paragraph 10.

22. Based on my training and experience and the training and experience of Resident Agent in Charge Douglas J. Zloto, as well as our familiarity with the investigation, I have probable cause to believe that McKnight was engaged in a classic "Ponzi" scheme in which Gregory McKnight paid older investor-victims with the money he received from newer investor-victims and that of the $72 million dollars McKnight raised from Legisi investors, McKnight only used a net of approximately $33 million to make the promised investments. In furtherance of his scheme to defraud, McKnight used or caused to be used electronic mail. During the course of the scheme, McKnight recruited investor-victims from across the United States, including from, among other places, Vermont, California, and Michigan. To date, I believe McKnight has defrauded his victims out of at least $40 million.

23. From in or about December 2005, up to and including on or at least through November 2007, in the Eastern District of Michigan and elsewhere, GREGORY McKNIGHT, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

Based on the above information, I believe that there is probable cause that the above-described items to be searched for and seized will be found in the above-described locations to be searched and that they will be relevant evidence to the perpetration of acts that are proscribed by 18 U.S.C. §§ 1341, 1343, and 1344.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.                         CIVIL ACTION No.

MATTHEW J. GAGNON,          HON.

        Defendant.

_____/

## COMPLAINT

The Plaintiff, Securities and Exchange Commission ("Commission"), alleges and states as follows:

## SUMMARY

1.    Defendant Matthew J. Gagnon ("Gagnon") is a resident of Portland, Oregon and Weslaco, Texas. Since at least 1997, Gagnon has operated a website named Mazu, found on the World Wide Web at www.mazu.com ("Mazu website"). Gagnon has billed the Mazu website as "the world's first and largest opportunity review website."

2.    Since at least 1997, Gagnon has touted himself on the Mazu website as an Internet business opportunity expert. Gagnon has reviewed for his readers various on-line business opportunities, such as multi-level marketing programs, direct marketing, and arbitrage trading. Gagnon has recommended some and has not recommended others. He has sold materials to the general public regarding such business opportunities. These materials have included promotional booklets and DVDs known as "Mazu Business Packs" or "Quick Start Guides" (collectively, "Mazu Business Packs"). These Mazu Business Packs have contained additional

by claiming McKnight had deceived him about how he had used Legisi investor money and the losses he had suffered.

123. Gagnon then attempted to extort money from McKnight. On September 9, 2007, Gagnon informed McKnight that he was ending the partnership between Legisi and Mazu. Gagnon offered McKnight a choice: send Gagnon and several of Gagnon's associates approximately $2.5 million, tell the Legisi members that Gagnon was starting a real estate fund, and that Mazu and Legisi were parting amicably, or Gagnon would email the entire Legisi membership and tell them "the truth" about McKnight's fraud.

124. The next day, McKnight transferred $61,698 from his E-Bullion account to the E-Bullion account of Gagnon's office manager.

125. On September 12, 2007, McKnight wrote on the Legisi Forum that Mazu and Legisi were no longer working together, that the parting was "completely amicable," and that Mazu was "simply moving on to other ventures."

126. Gagnon's efforts at extorting money from McKnight were not limited to e-mail. Early the morning of November 26, 2007, Gagnon, Skordal, and another man arrived unannounced at McKnight's home and demanded he pay them the remainder of what they claimed he owed them. That same day, McKnight withdrew $45,000 from his bank, sending $15,000 to each man. McKnight wired an additional $70,000 to Gagnon on November 30, 2007.

127. On April 9, 2008, the Commission staff sent Gagnon's attorney a declaration for Gagnon to sign in which he would assert his Fifth Amendment privilege against self-incrimination, refusing to answer all questions about Mazu Publishing, the Legisi Program, McKnight, or any of McKnight's companies in lieu of testifying before the Commission staff in connection with its investigation into McKnight and the Legisi Program.

# EXHIBIT 5

EXH. 5

U.S. SECRET SERVICE INVESTIGATIVE REPORT

FROM:  SAGINAW RESIDENT OFFICE                    FILE: J-228-777-1560-S
                                                  X-REF: J-327-774-8703-S
TO:    CRIMINAL INVESTIGATIVE DIVISION    SEIZURE: N/A

INFO:  INVESTIGATIVE SUPPORT DIVISION
       DETROIT FIELD OFFICE
       GRAND RAPIDS RESIDENT OFFICE

SUBJECT: REPORT OF CONTINUING INVESTIGATION

ACTUAL LOSS:  $40,000,000    POTENTIAL LOSS: $ 72,000,000

CASE TITLE:              LEGISI INC
CASE TYPE:               777.350, INVESTMENT FRAUD
SECONDARY TYPES:         708.010, 848.910
CONTROLLING OFFICE:      SAGINAW RESIDENT OFFICE
REPORT MADE BY:          CASE SA AARON KNUDSON (989) 497-0580
DATE CASE OPENED:        06/04/07
PREVIOUS REPORT:         CONTINUING INVESTIGATION - 9/5/08
REPORTING PERIOD:        9/6/08 - 1/3/09
STATUS:                  CONTINUED

SYNOPSIS:

McKnight met with agents and the Managing Assistant United States
Attorney during a Proffer meeting. McKnight disclosed information about
how he ran operations for Legisi, in attempt to lessen his jail
sentence.

The Detroit Field Office is requested to complete an ECSAP exam on nine
computer hard drives as well as two Xbox game systems.

This case continues pending further investigation and judicial action.

DETAILS OF INVESTIGATION:

Reference is made to previous reports in this case, the latest being
the Report of Continuing Investigation, dated 9/5/08.

On 11/6/08, I received a copy of the Kastigar agreement from Managing
Assistant United States Attorney (MAUSA), Barbara Tanase, 600 Church
St, Flint, MI that was sent to Edward Wishnow, McKnight's attorney.

On 11/21/08, MAUSA Barbara Tanase, RAIC Douglas Zloto and I met with
Gregory McKnight and Edward Wishnow for a Proffer meeting at the United
States Attorney's Office, 600 Church St, Flint, MI. Also present in the
meeting was Jim O'Keefe and John Berkheimer from the Securities and
Exchange Commission (SEC). The meeting took place at the United States
Attorneys Office, Flint, MI.

At the beginning of the meeting, MAUSA Tanase reminded McKnight that he
was meeting with us voluntarily. He was told that in order to lessen
his jail sentence he needed to provide true and factual information.

McKnight was also told he could leave at anytime. McKnight agreed to speak to us.

McKnight began by stating he had maintained steady employment since he was arrested. He had been driving trucks for several months, but recently quiet and got a new job at Sharps Funeral Home. McKnight also said his wife, Linda McKnight works at "Sam's Club" in Grand Blanc, MI. McKnight said his wife cashed in her 401k, worth twenty-five thousand dollars, to help pay bills. All their income gets deposited into Linda's Sage Link Credit Union account. McKnight also advised they have received financial help from friends and family. He said he purchased a used car for fifteen thousand dollars in order to get to work.

McKnight said he first began in electronic digital currency with a company called "DX Gold", which Matt Gagon introduced him to. DX Gold was a company that exchanged e-gold and e-bullion currency. McKnight claimed he made between twenty and thirty thousand dollars a year with DX Gold. McKnight told us he had been studying High Yield Interest Programs (HYIP's). McKnight thought he could create a legitimate HYIP that would make a profit himself and his clients. He said he gained his HYIP knowledge and expertise through the internet. McKnight said he wanted to start a local business to buy, sell and fix-up homes. In order to fund this business, he did not want to borrow money from banks, but instead wanted to borrow money from individuals. McKnight would offer a HYIP to receive money and put the profits toward the buying of homes. McKnight claimed his plan was to return a higher percentage of money to his lenders, and keep a minimal amount for himself. He said he decided to pay himself three thousand dollars a week for the work he did in investing his client's money.

McKnight said the Legisi Marketing website was first available on 12/28/05; however he did not receive his first loan until the following month in 01/06. McKnight had purchased a "Canned" HYIP computer management program for $100 to help start up and run the Legisi Marketing website. McKnight claimed most of the wording and instructions on the website were directly from the "Canned" program. However, he did change some words in order to meet his needs and specifications. McKnight went on to say that at the beginning of the business, he only had one e-gold account which would allow up to $100,000 of transactions per day. By 2/06, he had twenty to thirty lenders and could no longer operate with just one e-gold account. This required McKnight to open several additional e-gold and e-bullion accounts.

In 02/06 after McKnight started Legisi, Matt Gagon approached him and asked to become a business partner in Legisi. Gagon wanted to market Legisi on the internet through his web based company, "Mazu Publishing". Mazu Publishing would provide website and telephone support for Legisi. McKnight agreed, and decided he would split all the profits as well give Gagon 5% of each loan he referred to Legisi. Gagon would receive a payment each month. Gagon also invested an initial one million dollars into Legisi, and would reinvest it each month, according to McKnight. McKnight went on to say he would base Gagon's monthly payment off of estimated profits. McKnight estimated these profits by speaking with his brokerage company Hamilton Chase. Hamilton Chase was based in Boca Rotan, Florida. The brokers McKnight worked with at Hamilton Chase were Linda Griseman who was McKnight's personal

broker, Jack Levy and Terren Maller. McKnight clarified that Hamilton Chase would only give him vague verbal indications on how the investments were doing. Profits were not based on the monthly sale of investments, but rather on his conversations and feelings. McKnight would split the amount, and give Gagon his share, plus the 5% for each referral he provided.

McKnight said during the first years of Legisi, he had other sources of income as well. He mentioned he sold products for a company called "Bio Metrics", which is part of a company called Mannitech. McKnight first met Gagon in 2002 in Chicago at a Mannitech conference. Gagon helped McKnight sign up to become a distributor for the company to sell health products to individuals. McKnight said he also began the company "Lido Consulting", which he created to help fund another business he started, "Lindenwood LLC". Lindenwood LLC owned a house on Linden Rd in Swartz Creek. McKnight had great plans to buy commercial property and build a storage unit facility. McKnight consulted with friend and realtor, David Bistricky of American Association, Inc. in Flint, MI. McKnight purchased his residence from Bistricky, along with several other residential rental properties. Bistricky told McKnight there was money to be made in rental storage facilities.  Bistricky later found a vacant plot of land for sale, and eventually sold it to McKnight for the future development of a storage unit facility.

When Mazu Publishing first began marketing for Legisi, Gagon's employee, Mary Kean, worked as the moderator between Mazu and Legisi. She would answer questions from investors who either called on the telephone or asked through the Legisi forum website. McKnight said when anyone called Legisi, they would usually talk to Kean. Also working at Mazu Publishing were Michael Wolebche, Martin Langly, and Doug Skortal. Langly was responsible for maintaining and operating the Legisi Forum webpage. Skortal was second in charge of Mazu, directly beneath Gagon.

McKnight said even though Gagon was receiving half of the profits, he was not a partner in the business. Though McKnight did talk to Gagon, and would sometime seek advice from him, Gagon did not make any decisions on how or what to invest the money in.

McKnight advertised to his lenders that he invested heavily in foreign currency and had professional brokers who advise him what to invest in. McKnight invested in Forward Forex, through Hamilton Chase. McKnight said he would talk to Griseman at least once a week. With the information received from Griseman and Hamilton Chase, McKnight projected he was creating a 24% profit each month while investing in the foreign currency. McKnight stated he did not know how Hamilton Chase based their projections or their "profits", however he never bothered to ask them or to clarify how they got their results. He also said he never received any documentation from Hamilton Chase showing his profits, but instead, he just talked to the brokers over the phone, and would be told a general amount of profit, not a specific dollar amount. McKnight said he would make his own projections and create his own estimates of profits by how much money was "loaned" to his company and how much money he withdrew. McKnight said it was not an exact science.

In 5/06, McKnight claimed someone hacked into his e-bullion account, and made three separate automated withdraws, totaling $855,000. At a

later date, e-bullion returned the total amount. He said in the end, there was no financial loss to him or his company. However, because the accounts were hacked into, he decided to seek legal advice about moving his money and accounts offshore. He claimed he spoke to a lawyer about moving the money offshore, and was told it was okay. McKnight could not remember the lawyer's name, the law firm, or how he heard about the law firm.

McKnight said up until 7/06, his internet provider was "Go Daddy" (aplus.net), a Kansas run business. With the volume of internet business he was conducting, he hired Jack Lund to install new internet server hardware allowing the server and website to move to off shore to Panama. However, the Legisi Forum continued to operate using the Go Daddy server. McKnight continued to act as the administrator to both the server and website, but allowed Mary Kean of Mazu Publishing, administrative access but without being able to make any changes. McKnight said Jack Lund was also given administration access to help make major changes to the website. Danielle Burton was also given limited administrative access for day to day operations.

In the summer of 2006, Forward Forex went out of business, so Hamilton Chase steered McKnight to invest in Ikon. McKnight said he did not stay with Ikon very long, and soon quit investing through Hamilton Chase after his broker, Linda Griseman referred him to ComTrust where they primarily dealt with commodities and foreign currency. Griseman told McKnight that Jamie Duncanson was a broker there, and a good friend.

McKnight said Duncanson did not work directly for ComTrust, but rather through it as an independent broker. He claimed Duncanson never loaned him or Legisi money, nor did he ever tell her about what his company did. When McKnight hired Duncanson as his broker, they agreed, by her recommendation, that he would pay her a commission of $50 to $90 per transaction bought. Duncanson and her associate, Lynn, unknown last name, would advise McKnight on what they saw was the best options to invest in. McKnight said he would still be the one to authorize the transactions; however he later said he trusted her enough to allow her to make transactions without consulting with him. Duncanson usually bought and traded twenty to thirty transactions a month. McKnight said he felt confident in Duncanson's knowledge and expertise in deciding what stocks and options to buy. When they would talk on the phone, Duncanson told him that he was making a lot of money and doing really well with the commodities they purchased. However, at the end of each month, McKnight would receive a statement with all of the options bought, traded, or sold. The statement would also include the total commission McKnight paid Duncanson that month. McKnight told us when he received the statements, his impression was that he was losing money, not making it like what Duncanson claimed. McKnight told us he was confused on how he could be losing money but still make a profit. Despite his confusion, he was comfortable with Duncansons advice and the choices she made in investing his money. He did not seek any outside legal or financial advice to see if Duncanson was defrauding him. Instead, he proclaimed to the people loaning him money, that he was indeed making a very large profit. McKnight told us he felt comfortable with the amount of commission he paid Duncanson. However he was unable to say roughly how much he had paid her.

When RAIC Zloto told him that he paid Duncanson nearly three million dollars, McKnight appeared dumbfounded. He was confused how and why she was paid that much money. McKnight then claimed that when he received the monthly statement, he would just file them without looking at them. McKnight continued to find it unbelievable that he would pay her that much money.

McKnight told us his relationship with Duncanson was strictly business and that she had talked to him about other ways to help make money. Duncanson introduced McKnight to her brother, name unknown, who McKnight eventually sold sixty gold coins to for fifty thousand dollars. Duncanson also recommended that McKnight open a bank account in the Turks and Caicos. She said she had a cousin who worked at a bank in Turks and Caicos and could help him establish an account. McKnight said he completed a bank account application with a bank in the Turks, however he denied ever opening an account there. When asked why there were open accounts in his name in the Turks and Caicos, he told us someone must have stolen and used his name and social security number to create them.

During the time agents and MAUSA Tanase talked to McKnight about Jamie Duncanson, he appeared hesitant to answer, and when he did, he appeared to not be completely honest about his business or personal involvement with her.

Up until the summer of 2006, McKnight did his personal banking at 5/3 Bank. However, 5/3 Bank decided they did not want his business anymore, and gave him a check for the amount of $2.2 million dollar that was in his account. McKnight said that money was money he received from his different e-gold accounts and also the account from which he would wire money to brokers. McKnight said he eventually opened a LaSalle Bank account.

McKnight said after 9/07, he received a letter from the SEC advising McKnight they were investigating him and Legisi. After the SEC froze several accounts during the investigation, Gagon became upset and quite worried and concerned about his involvement with Legisi. Gagon wrote a letter to McKnight advising him Mazu Publishing would no longer market Legisi. McKnight said Gagon immediately stopped marketing for Legisi, but continued to reinvest his initial one million dollars into Legisi. McKnight said there were no hard feelings, and he continued to give Gagon his monthly incurred interest from his account. According to McKnight, when Gagon left, he gave McKnight a list of twenty or thirty people he wanted McKnight to pay off immediately. The list of people was mostly Gagon's family and friends. McKnight told us that he did not give anyone on the list any money because they were in the same boat as the rest of the loaners.

McKnight went on to say he did pay off some people, particularly the original people who loaned money to Legisi. He then paid off family and friends before investors he never met or knew on a personal basis. McKnight told us he paid his friends and family first because he "Still had to live in my community".

McKnight claimed that in 12/07, Gagon, who lived in Texas, showed up at his house unannounced early one morning. Along with Gagon was Doug Skortal, who was second in charge of Mazu Publishing, and a James

McDonald. McKnight said they wanted to talk about their worries and the way McKnight was handling the money loaned to him. Gagon, Skortal and McDonald told McKnight they wanted to collect their money that he owed them. McKnight said he figured it was around one to two million dollars, and told them he did not have that kind of money at hand, but was able to give each of them a fifteen thousand dollar check to help them. Also at a later time, McKnight gave McDonald one million shares of Tactical Solutions. Gagon would occasionally call and ask for more money, in which McKnight would send him twenty-five thousand. McKnight last spoke to Gagon in 5/08. McKnight said he has sent Gagon a total of around five million dollars that included money from his loan and referrals.

McKnight said to help keep "money flowing" into Legisi, he acquired two loadable debit cards from a bank in Estonia to have access to his e-gold accounts. He claimed he used the bank in Estonia because U.S. banks did not offer debit cards linked to e-gold accounts. He went on to say that once he received the cards, he never used them or activated them. He also told us he had two Cash-Link Gold cards and deposited a few thousand dollars into them which he used for personal use.

McKnight told us he created a few e-gold or e-bullion accounts and Legisi accounts for people who wanted to loan money to Legisi. He would normally only do this for clients who were unfamiliar with computers or didn't have access to a computer. He said he couldn't remember how many he did this for, but mentioned he did remember creating e-bullion accounts for his sister Theresa Burton, and later loaned her thirty to forty thousand dollars for home renovations. He also opened an e-bullion account for Danielle Burton, niece and employee, and would put money into that account rather then give her a paycheck.

McKnight said it was not uncommon for him to help out people financially. He loaned his father fifty thousand dollars and placed it into a Legisi account. He claimed his father did not have money to open an account, and asked McKnight to loan him the money so that he could keep the incurred interest, and eventually repay the initial loan. McKnight also loaned Mark Aites, head pastor of McKnight's church, Swartz Creek Church of Christ, twenty thousand dollars. Aites repaid McKnight three hundred dollars a month for several months, but eventually stopped. Aites had a Legisi account at one time, but did not keep it open long. McKnight could not recall the dates he loaned money to Aites. McKnight also loaned Ryan Burton, nephew and employee, money to help pay off student loans. Ryan paid the money back by using payroll deductions. McKnight said he also gave money regularly to Swartz Creek Church of Christ for his tithe. He said he would give anywhere between five hundred and twelve thousand dollars each month. He said since his bank accounts were frozen and seized, he continues to tithe to the church, just not as much.

On 11/25/08, a meeting took place at Clark Hill and Associates. Present during the meeting were Ed Hood, Jaimi Statham, Chuck Murphy, Bob Gordon, Joel Applebaum all from Clark Hill; Gregory McKnight and his attorney, Ed Wishnow, Becky Johnson, Court Reporter for Bienenstock Court Reporting and Video, RAIC Zloto and I.

During the meeting, McKnight reiterated the same facts and story regarding Legisi that he told agents on 11/21/08.

Court Reporter, Becky Johnson, recorded and transcribed what was said during the meeting. Johnson later provided our office with a copy of the transcript which was placed on the Secret Service share drive. For a complete dialogue of what was talked about during the meeting refer to the transcript Johnson provided.

On 12/5/08, RAIC Zloto and I had a telephonic meeting with Phillip Raleigh and Vick Frabis of the National Futures Association (NFA) (312-781-1229), 300 S. Riverside Plaza, Chicago, IL 60606. Raleigh and Frabis conducted an extensive investigation into Jamie Duncanson of ComTrust. After the meeting, RAIC Zloto sent Raleigh a letter requesting that the NFA share information with this Service concerning Jamie Duncanson.

Raleigh and Frabis told us that Duncanson used to be a principle at Forex LLC and also with Commodities Futures Consulting Corporation (CFCC), another Forex Company. She currently is not a member of NFA because she does not do any trading, nor does she have any active clients. In her position, she can gain clients, but then introduces them to a company that does the actual trading. In Duncanson's case, it would be ComTrust. Duncanson was not an employee of ComTrust, but rather she was an independent broker who would gain her own clientele, introduce them to and trade through ComTrust. Duncanson is not allowed to hold any client's money, but instead transfer funds to ComTrust. A broker such as Duncanson does not have any regulations restricting the amount of commission they can charge per transaction. So the commission she was charging McKnight of one hundred and thirty dollars, would be considered normal. For comparison, they said ComTrust and other active brokers would only charge about thirteen dollars per trade.

According to Raleigh and Frabis, Duncanson had only five accounts she dealt with. Three accounts belonged to Legisi, and two belonged to Lido Consulting; all owned by Gregory McKnight. Between 12/22/06 and 2/15/08, Duncanson received $1.7 million in commission from trading options for the five accounts belonging to McKnight.

Duncanson hired Howard Miller as an assistant. Raleigh and Frabis said that Miller is a notorious broker who has been under investigation and scrutiny for many years because of his brokerage practices.

The NFA audited the CFCC and also interviewed Duncanson. Duncanson provided very little information to the NFC. She mentioned she first came in contact with McKnight through Linda Griseman of Hamilton Chase. The NFA asked her about her due diligence and Legisi and McKnight. She responded, "Ask Jim O'Keefe" (of the SEC). Duncanson was also hesitant to provide any of her bank account information or money market account information, but did eventually comply.

Raleigh told us that NFA filed a civil suite against Duncanson because she failed to file any Suspicious Activity Report (SAR's) on the money transactions Legisi had with ComTrust. She also did not follow the internal policy of ComTrust of filing a SAR's report. When asked, Duncanson said, Legisi's "Money transfers were not suspicious enough to her to warrant a filing a SAR". NFC charged ComTrust for fraudulent sales and failure to file SARs. Duncanson agreed to give up her